M. P. FRANK AND BEATRICE FRANK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4436-66. Filed January 26, 1970.

---

76

*Marvin E. Klitsner* and *William J. Willis*, for the petitioners.
*Sheldon Chertow*, for the respondent.

OPINION

At the outset, we observe that it cannot be disputed that either the stock options or the underlying stock involved herein is taxable to petitioner at some point in time. The Supreme Court has clearly held that such stock options represent an economic benefit to petitioner, includable in his gross income as compensation for services rendered within the meaning of section 61 (a). *Commissioner* v. *LoBue*, 351 U.S. 243, 247 (1956).

The crux of the controversy between the parties concerns the selection of the appropriate taxable event. Petitioner's primary argument is that he is taxable at the time of *grant* of the options at issue; whereas, respondent contends for taxation at the time of *exercise* of such options.

Determination of the taxable event affects not only the *amount* includable in petitioner's gross income, but also the *character* of that income. The facts of this case indicate that the value of stock at issue increased during the period between the date of grant (September 2, 1958) and the date of exercise (September 28, 1960). If date of grant is chosen as the appropriate taxable event, only the fair market value of the options themselves would be includable in petitioner's gross income at ordinary rates, and all subsequent increments in value would be taxable to him at capital gain rates.[3] On the other hand, if date of exercise is selected as the taxable event, petitioner must include in gross income at ordinary rates the difference between the amount he paid for the stock (i.e., the exercise price) and the fair market value of such stock on the exercise date, and only those increases in value which occur subsequent to the exercise date would be accorded capital gain treatment.

*Issue 1. Applicability of the Nonstatutory Stock Option Regulations*

Both parties agree that the stock options here involved fail to qualify for the treatment accorded statutory stock options under sections 421 through 425, and consequently, are to be considered as non-

---

[3] This assumes that following exercise of the option, the stock would be a capital asset in petitioner's hands. The record does not reveal anything to the contrary, and the parties do not contend otherwise.

statutory stock options for tax purposes. While there is no statutory authority, with the exception of the general provisions of section 61 (a), governing the taxation of nonstatutory stock options, the Commissioner has promulgated regulations (sec. 1.421–6, Income Tax Regs.) setting forth rather detailed rules for the nonstatutory stock option area. These regulations are concerned with the taxation of nonstatutory stock options granted "to an employee or other person for any reason connected with the employment of such employee." Sec. 1.421–6(a)(1), Income Tax Regs. However, these regulations were not applicable to options received by independent contractors or other nonemployees during the years involved herein.[4]

Petitioner contests the applicability of the nonstatutory stock option regulations to this case primarily on the ground that he was not an employee of either MGIC or GIAI. Alternatively, he argues that even assuming *arguendo* that he was such an employee, the options at issue were not granted for any reason connected with his employment. We disagree.

Section 1.421–6(b)(2), Income Tax Regs., refers to section 3401(c) and the regulations thereunder for the rules applicable to the determination whether the required employer-employee relationship exists for purposes of the nonstatutory stock option regulations. Pertinent provisions of the section 31.3401(c) regulations are set forth below:

Sec. 31.3401(c)–1. Employee.

(b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * *

(c) Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are not employees.

(d) Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(f) All classes or grades of employees are included within the relationship of employer and employee. Thus, superintendents, managers, and other supervisory personnel are employees. Generally, an officer of a corporation is an employee of the corporation. * * *

---

[4] Sec. 1.61–15, Income Tax Regs., which was added to the regulations subsequent to the years at issue makes the rules contained in sec. 1.421–6 of such regulations applicable to options granted certain nonemployees after July 11, 1963.

In accordance with paragraph (d) above, we have examined all the facts and circumstances of the instant case in order to determine whether an employer-employee relationship existed between petitioner and MGIC and GIAI, respectively, during the years involved herein. The facts show that petitioner was a promoter and organizer of both MGIC and GIAI prior to their respective incorporation dates. Thereafter, he served as director of both corporations and president of GIAI until July 1, 1959, and as secretary-treasurer of MGIC until September 27, 1960. Paragraph (f) of the above-quoted regulations clearly indicates that as a general rule an officer of a corporation is considered to be an employee thereof.

In an effort to except himself from the operation of this general rule, petitioner relies upon his testimony before this Court, which was to the effect that the services he performed as an officer of the two corporations were minor in nature. To the contrary, close scrutiny of the MGIC and GIAI corporate minutes and other exhibits in the record before us reveals that petitioner, in his testimony before us, unduly minimized the role he played as secretary-treasurer and president of MGIC and GIAI respectively.

Article IV of the bylaws of both MGIC and GIAI confer substantial responsibilities and duties upon the offices held by petitioner with these corporations.

The MGIC corporate minutes indicate that petitioner in his capacity as secretary of MGIC fulfilled the duties of that office as prescribed in the bylaws. Petitioner attended and participated in at least 16 MGIC board meetings and 5 MGIC shareholder meetings held during the years 1957, 1958, and 1959. He presumably prepared the minutes for each of these 21 meetings inasmuch as his name and the designation "Secretary" appears at the end of each set of minutes. On February 18, 1957, the MGIC board of directors authorized the president of MGIC and petitioner in his capacity as secretary thereof to borrow $200,000 from American State Bank, Milwaukee, Wis. At a MGIC board meeting held on March 29, 1957, petitioner presented a plan concerning the insurance of mortgages secured by a bond issue, and the board authorized him to proceed with further negotiations relating to this plan. On May 6, 1957, petitioner submitted a report of contacts with lending institutions in Madison, Wis., to the MGIC board. In a meeting held on January 8, 1958, the MGIC board conferred general management authority, including the hiring of personnel, on a three-man committee consisting of Max H. Karl, Spiros W. Kallas, and petitioner. Petitioner was authorized to sign checks and make deposits to various MGIC bank accounts.

The GIAI corporate minutes likewise indicate that petitioner carried out the duties of president of GIAI in accordance with the provisions of the bylaws. He attended and chaired at least six GIAI board meetings and at least one GIAI shareholders meeting held during the years 1957 through 1959. On January 8, 1958, the GIAI board unanimously agreed that the management of GIAI would be vested in a three-man board composed of petitioner (president), Spiros W. Kallas (vice president), and Mary Jane Johnston (secretary-treasurer). Petitioner was authorized to sign checks and make deposits to the GIAI account with North Shore State Bank of Shorewood, Wisconsin.

Faced, as we are, with this rather considerable evidence to the contrary, we cannot accept petitioner's testimony that he performed only minor services for MGIC and GIAI. Nor are we persuaded by his argument that such services were rendered gratuitously. As will be more thoroughly discussed later, we are convinced that the options granted to petitioner in 1958 were, among other things, intended as compensation for petitioner's services as an officer of both corporations.

Finally, we find no merit in petitioner's contention that there is no evidence in the record that MGIC or GIAI had the right to direct and control the performance of his duties in accordance with paragraph (b) of the section 3401 (c) regulations. The bylaws of both corporations clearly provide that the board of directors has the traditional board power to elect, remove from office, or prescribe duties for the president, secretary, and treasurer of such corporations. It would therefore appear that MGIC and GIAI had the customary power of a corporation to direct and control its officers in the performance of their duties. Thus, we have concluded that a bona fide employer-employee relationship did exist between petitioner and MGIC and GIAI, respectively.

In support of his alternative argument, petitioner relies on his testimony that the options at issue represented compensation for his efforts as an organizer, incorporator, and promoter of the two corporations, rather than remuneration for any services he may have rendered as an employee thereof. We would agree that the original option granted by MGIC prior to its incorporation was issued to petitioner in consideration for his proposed organizational and promotional efforts on behalf of MGIC. However, the options granted in 1958, while petitioner was serving as an officer of both corporations, are another matter. Under the 1958 options, petitioner received the following benefits not found in the original option: (1) The option period was extended 3 years (i.e., to a period of time when the fair market value of the underlying stock was likely to be higher) and (2) an option to buy GIAI stock was added.

It would be naive to think that these valuable additional benefits were not granted as a result of petitioner's very substantial services as an officer of the two issuing corporations.[5] Consequently, we conclude that the 1958 options were given for reasons connected with petitioner's employment by MGIC and GIAI.

In view of the foregoing, we hold that the rules contained in section 1.421-6 of the regulations, dealing with the taxation of nonstatutory stock options, are applicable to the instant case.

### Issue 2. Tax Consequences at Date of Grant

Having determined the applicability of the nonstatutory stock option regulations, our task becomes one of applying the rules contained therein to the facts of the instant case to determine the appropriate moment of taxation.

Section 1.421-6(c)(3)(i) of these regulations provides that where, as here, the option is not actively traded on an established market, the fair market value of such option is not readily ascertainable unless that value can be measured with reasonable accuracy, which requires that the taxpayer be able to show that all of the following conditions exist:

(a) The option is freely transferable by the optionee;

(b) The option is exercisable immediately in full by the optionee;

(c) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option or such property; and

(d) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of this subparagraph.

Subdivision (ii) provides in pertinent part:

(ii) * * * The option privilege is the opportunity to benefit at any time during the period the option may be exercised from any appreciation during such period in the value of the property subject to the option without risking any capital. Therefore, the fair market value of an option is not merely the difference which may exist at a particular time between the option price and the value of the property subject to the option but also includes the value of the option privilege. Accordingly, for purposes of this section, the fair market value of the option is not readily ascertainable unless the value of the option privilege can be measured with reasonable accuracy. In determining whether the value of the option privilege is readily ascertainable, and in determining the amount of such value when such value is readily ascertainable, it is necessary to consider—

(a) Whether the value of the property subject to the option can be ascertained;

---

[5] We observe that the option agreements of Sept. 2, 1958, contain a recital that the 1958 options were granted "in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, particularly by reason of Frank's [petitioner's] organizational and promotional activity." The "other good and valuable consideration" surely must include his substantial services as an officer of both corporations.

(b) The probability of any ascertainable value of such property increasing or decreasing; and

(c) The length of the period during which the option can be exercised.

The parties are in agreement that conditions (a) through (c) of subdivision (i) are satisfied under the facts of this case inasmuch as the options here involved were freely transferable, immediately exercisable in full, and not subject to any restrictions or conditions. Thus, the issue narrows to a question of whether the fair market value of the option privilege is readily ascertainable within the meaning of subdivision (ii) above.

In support of his position that the option privilege did have a readily ascertainable fair market value, petitioner relies upon the testimony of his expert witness, Ralph Inbusch, Jr. (hereinafter referred to as Inbusch), partner in a stock brokerage firm. Inbusch testified that, although the original option had no ascertainable value at grant,[6] the 1958 options had a fair market value of approximately $200 per unit [7] (or approximately 35 percent of the $575 issuing price of a unit of MGIC stock) at the time of their grant on September 2, 1958. In determining this value, Inbusch took into consideration (1) the $50 positive differential between the exercise price ($525 per unit of MGIC) and the issuing price ($575 per unit) of the stock and (2) the speculative value of the option which he described as being composed of a time factor (the length of the exercise period during which petitioner could take advantage of the option price) and a hedge factor (the fact that petitioner does not have to risk his capital during the exercise period). Included among the factors he examined in valuing the option privilege were the following: (1) The market value (issue price) of MGIC stock of $575 per unit; (2) the fixed option price of $525 per unit; (3) the 4¼-year duration of the exercise period; (4) the prospects for the future success of MGIC and GIAI; and (5) marketability of MGIC and GIAI stock. Inbusch assigned approximate values of $35 or $40 to the positive differential and $150 or $160 to the speculative value (approximately $100 to the time factor and $50 or $60 to the hedge factor) in arriving at a total approximate value for the options of $200 per MGIC unit. Inbusch stated that he arrived at these numbers through the use of his expert

---

[6] Two of the expert witnesses appearing in this case were in agreement that the original option had no ascertainable value at the date of grant on Sept. 1, 1956. The third expert did not testify on this point. MGIC and GIAI were not even in existence on this date. Therefore, the remaining discussion will be concerned only with the options granted on Sept. 2, 1958.

[7] According to Inbusch's testimony, this option value is equivalent to an adjusted per share price of approximately 55 cents compared with an adjusted per share price for MGIC stock of $1.56. These prices include adjustments for all stock splits and reorganizations occurring on or before Sept. 28, 1960.

judgment, and admitted that other informed experts could differ on the value of the options within a range of approximately 25 percent to 45 percent of the value of the stock.

Respondent introduced the testimony of two well-qualified expert witnesses, James H. Lorie (hereinafter referred to as Lorie), professor of business administration and director of a center for research in security prices, and Marius A. Robinson (hereinafter referred to as Robinson), investment analyst and founder of a stock option dealership, concerning the value of the options granted on September 2, 1958. Both were in substantial agreement with Inbusch with respect to the factors [8] to be considered in valuing options. However, they each independently concluded that some of these factors are so uncertain under the facts of this case as to make it impossible to value the options with reasonable accuracy at the time of their grant on September 2, 1958. Lorie stressed the difficulty of determining the fair market value of the stock based upon the few isolated transactions between third parties. Other elements, which in Lorie's opinion contributed to the complexity of valuing the options, were the unique nature and extremely brief history of the company. Robinson seriously questioned whether the market value of the stock was accurately reflected by the available data herein, and emphasized the wide disparity of opinion that would arise among experts attempting to ascertain the company's future prospects for success. Lorie expressed the view that Inbusch may have understated the range within which expert opinion could vary on the question of the value of the options. Robinson estimated that a reasonable analyst would be willing to pay anywhere from 10 to 50 percent of the fair market value of the stock for the options depending upon his judgment as to the future value of the stock.

The opinion of respondent's experts finds support in the record before us. First, as illustrated by the chart set forth in our Findings of Fact, there were only a few isolated transactions among third parties occurring between the dates of incorporation of MGIC and GIAI and the month (September 1958) the options at issue were granted. Furthermore, as that same chart points up, the selling price of the stock generally followed seller's cost rather than the issue price as assumed by Inbusch. For instance, on September 5, 1958 (3 days after the date of grant), four units of MGIC were sold to Morey Cohen at the price of $550 per unit, which amount corresponds to seller's cost of those shares rather than the issue price of $575 per unit.

---

[8] Lorie testified that the market value of the stock, the option price, the duration of the option, and the prospects for the company were the factors pertinent to an evaluation of stock options. Similarly, Robinson considered the market price of the stock, the exercise price, the prospects for the company, and the marketability of its stock to be the factors upon which an evaluation of options should be made.

Secondly, the record indicates that MGIC was the first private insurance company to enter the field of mortgage loan insurance since other such private insurers failed during the 1930's. Consequently, there was little or no experience of record to serve as a guide with which to estimate the risks involved. Moreover, at the date of grant on September 2, 1958, MGIC and GIAI had been operating less than 2 years and had incurred losses at the close of each.

Based upon the credible testimony of respondent's expert witnesses and the foregoing evidence, we conclude that on September 2, 1958 (date of grant of the options at issue), the fair market value of the stock here involved, and the probability that such stock would increase or decrease in value could not be ascertained with reasonable accuracy. Hence, considerations (a) and (b) of subdivision (ii) of the section 1.421–6 (c) (3) regulations are not satisfied under the facts of this case.

Petitioner next contends that condition (d) of section 1.421–6 (c) (3) (i) is invalid inasmuch as it is contrary to the 16th amendment, sec. 61 (a), and the case law interpreting the application of section 61 (a) to the stock option area, especially the cases of *Commissioner* v. *Smith*, 324 U.S. 177 (1945), and *Commissioner* v. *LoBue, supra.*

In *Smith*, the taxpayer was employed by Western Cooperage Co. (hereinafter referred to as Western). In 1934, Western took over the management of Hawley Pulp & Paper Co. (hereinafter referred to as Hawley) at a time when Hawley was experiencing financial difficulties and had a large indebtedness. Under the terms of a contract between Hawley and Western, the latter agreed to periodically retire a portion of Hawley's indebtedness and, if Western was successful to the point of reducing such indebtedness in the amount of 1,400,000, Western was to receive a portion of Hawley's capital stock. In consideration for services he rendered in the reorganization of Hawley, the taxpayer was given an option in December 1934 to acquire a specified proportion of any Hawley shares Western might become entitled to under the contract. This option was exercisable only when Western's contract with Hawley was performed by the specified reduction of Hawley's indebtedness. In March 1938, Western became entitled to the Hawley stock and the taxpayer exercised his option during that and the following year. At the date of grant in 1934, the market price of the stock did not exceed the option price, but at the exercise dates in 1938 and 1939 the market value of the stock acquired by the taxpayer exceeded the option price in total respective sums of $81,021 and $71,663. Under these facts, the Supreme Court reasoned that the option itself was not the intended compensation because the trial court had found that it had no market value in excess of the stock at the time of grant. Therefore, concluded the Court, the underlying stock con-

stituted compensation income to the taxpayer to the extent of the difference between the option price and the fair market value of such stock at the exercise date. However, in stating its conclusion, the Court said:

Hence the compensation for respondent's services, which the parties contemplated, plainly was not confined to the mere delivery to respondent of an option of no present value, but included the compensation obtainable by the exercise of the option given for that purpose. It of course does not follow that in other circumstances not here present the option itself, rather than the proceeds of its exercise, could not be found to be the only intended compensation.

In *LoBue*, the taxpayer was manager of the New York Sales Division of Michigan Chemical Corp. In 1944, the company adopted a stock option plan making 10,000 shares of its common stock available for distribution to key employees at $5 per share over a 3-year period. The taxpayer was notified that he was one of the employees tentatively chosen to be a recipient of nontransferable stock options contingent upon his continued employment and satisfactory work. In recognition of the taxpayer's contributions to the company's success during the 3 years following the company's adoption of the stock option plan, the taxpayer was granted three stock options covering 340 shares. He exercised such options in 1946 and 1947 paying the company $1,700 for stock having a fair market value when delivered of $9,930. The Supreme Court held that the stock options constituted a substantial economic benefit to the taxpayer taxable to him as compensation for personal services under section 22(a), I.R.C. 1939 (progenitor of sec. 61(a), I.R.C. 1954). With respect to the time the gain should be measured, the Court held that, under the circumstances before it, the options were taxable at date of exercise. Again, the Court, in the following language left open the possibility that a subsequent case may arise wherein the option itself should be taxed to the recipient in the year of grant:

It is of course possible for the recipient of a stock option to realize an immediate taxable gain. See *Commissioner* v. *Smith*, 324 U.S. 177, 181–182. The option might have a readily ascertainable market value and the recipient might be free to sell his option. But this is not such a case. These three options were not transferable[8] and LoBue's right to buy stock under them was contingent upon his remaining an employee of the company until they were exercised. * * * [Footnote omitted.]

Petitioner argues that the Supreme Court in *Smith* was enunciating the "present value" rule, that is, if a compensatory option has a "present value" when granted it is taxable immediately. He further reasons that, in using the "readily ascertainable fair market value" language in *LoBue*, the Supreme Court was merely restating the "present value" rule, i.e., that where the option confers some benefit

upon the holder and in addition is free of restrictions and contingencies, it should be taxed at grant. In effect, petitioner is contending that where an option is freely transferable, immediately exercisable in full, and not subject to restrictions or conditions, then as a matter of law it is taxable at grant. Insofar as condition (d) of the regulations requires more, petitioner contends it is invalid.

To the contrary, condition (d) and subdivision (ii) of the regulations cast the "readily ascertainable fair market value" concept in the posture of a factual determination rather than a rule of law. Therein, it is provided that an option will not be considered to have a readily ascertainable fair market value, unless the option privilege is capable of being measured with reasonable accuracy. Several considerations are then set forth to be weighed in each particular case when making the factual determination. We consider these regulations to present a fair construction of what was intended by the Supreme Court in the *LoBue* opinion. That the factors set forth in subdivision (ii) are reasonable and in accord with the criteria used by stock option experts is evidenced by the fact that all three witnesses herein used substantially the same considerations in formulating their expert opinions. Surely, it cannot be considered unreasonable to require reasonable accuracy in the valuation of stock options. To hold otherwise would be to encourage estimates of fair market value of such rights on the basis of pure speculation and surmise. Cf. *Helvering* v. *Tex-Penn Oil Co.*, 300 U.S. 481 (1937); *Burnet* v. *Logan*, 283 U.S. 404 (1931); and *Stephen H. Dorsey*, 49 T.C. 606 (1968).

Petitioner relies upon three cases wherein stock options were valued at grant, i.e., *McNamara* v. *Commissioner*, 210 F. 2d 505 (C.A. 7, 1954), reversing and remanding 19 T.C. 1001 (1953); *Estate of Lauson Stone*, 19 T.C. 872 (1953), affd. 210 F. 2d 33 (C.A. 3, 1954); and *Colton* v. *Williams*, 209 F. Supp. 381 (N.D. Ohio 1962). Inasmuch as each of these cases turns upon its own facts, it would seem to serve no useful purposes to discuss these cases in detail herein. Suffice it to say that each of these cases is factually distinguishable from the instant case.

Based upon the foregoing, we hold that the options at issue did not have a readily ascertainable value at the time of their grant on September 2, 1958.

### Issue 3. Tax Consequences at Date of Exercise

Subparagraph (1) of section 1.421–6(d), Income Tax Regs., sets forth the general rule that where, as here, an option does *not* have a readily ascertainable value at the time of grant, the employee realizes compensation at the time he acquires an unconditional right to receive

the property subject to the option. The regulations further provide that for purposes of paragraph (d) such an unconditional right shall not be deemed to have been acquired before the date of exercise. Under the facts of this case, petitioner had an unconditional right to receive and did in fact receive the optioned stock at the time of exercise. Thus, unless petitioner is able to bring the instant case within the province of an exception to this general rule, the stock he received upon exercise is taxable to him as compensation income on the date of exercise.

In an attempt to qualify for such an exception, petitioner advances the position that the underlying stock he received through exercise of the options was subject to restrictions which had a significant effect upon its fair market value, citing *Ira Hirsch*, 51 T.C. 121 (1968). As a result of such restrictions, he contends that taxation should be postponed beyond the exercise date in accordance with the following provision of section 1.421–6(d)(2)(i) of the regulations:

(2)(i) If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect on its value, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transaction, whichever occurs earlier, * * *

In *Ira Hirsch*, *supra*, we held that unregistered stock received by a taxpayer-employee upon exercise of a compensatory stock option, which was covered by an investment letter agreement not to resell for 6 months, was subject to restrictions having a significant effect upon value within the meaning of the above-quoted regulation. According to testimony given during the *Hirsch* trial, sale of the restricted stock was possible through a private placement or through an intrastate sale, but such a sale would result in a minimum discount of 20 to 50 percent from the fair market value of outstanding *registered and unrestricted* stock.

Petitioner argues that testimony which Inbusch gave in response to questions regarding the fair market value of petitioner's stock on the exercise date fits the mold of the *Hirsch* case, and that the rule invoked therein is equally applicable to the instant case. Inbusch testified that petitioner would sustain a discount in any attempt to market his stock as a result of the following factors: (1) Petitioner's holdings of MGIC stock were quite large after exercise; (2) such stock was not registered with the Securities and Exchange Commission (hereinafter referred to as the SEC); (3) petitioner as an insider could dispose of only limited amounts within a 6-month period; (4) registration of petitioner's shares with the SEC would be prohibitively expensive, and was probably not possible anyway since the company was new and highly speculative, and a public offering would appear to the investing public

to be a bail out by one of the company's organizers; (5) a private placement would be difficult due to cautious buying as a result of the recent rapid runup of the price on essentially isolated transactions, and because prospective purchasers would have to consent to "investment letter" restrictions.

Petitioner raises this argument for the first time on brief. Moreover, we note that this contention is inconsistent with his position that at the time of grant the "option or the property subject to the option" was not subject to any restriction having a significant effect upon the fair market value of such option or property as prescribed in condition (c) of section 1.421–6(c)(3)(i) of the regulations.

However this may be, we do not find the *Hirsch* doctrine to be controlling in the instant case. Unlike the taxpayer in *Hirsch*, petitioner acquired freely transferable stock which was not subject to investment letter restrictions. Furthermore, in *Hirsch* the Court was comparing the taxpayer's unregistered shares to outstanding registered shares. In this case, approximately 83 percent of the outstanding stock was not registered with the SEC and the remainder was subject to investment letter restrictions. Thus, in the marketplace petitioner's stock would not be considered inferior to the outstanding shares, and there would not be a discount based upon dissimilarity of petitioner's shares from those outstanding as was the case in *Hirsch*.

Likewise, we find no merit in petitioner's reliance upon Inbusch's testimony, which petitioner has taken out of context and attempted to force into the mold of the *Hirsch* rationale. We need not pass upon petitioner's allusion to the insider short-swing profit rule (Rule 16(b), Securities and Exchange Act of 1934) since that rule does not apply to sales by insiders of exempted securities. As will be further explained later, we believe petitioner could have disposed of his MGIC stock through exempted intrastate and private placement transactions. The fact that petitioner's holdings were large would not appear to constitute in and of itself a "restriction" upon the marketability of petitioner's stock within the intendment of the regulations but merely a factor to be considered in determining the market value of such stock. The same can be said with respect to Inbusch's testimony concerning the impact that the rapid price fluctuations and private-sale restrictions could have upon prospective purchasers of MGIC stock. We shall therefore reserve our comments upon Inbusch's testimony for our discussion regarding the fair market value of petitioner's stock at date of exercise.

Petitioner next contends that imposition of a tax upon his exercise of the options would raise the constitutional objection that he is in the same economic position immediately after exercise as before. He

cites *Eisner* v. *Macomber*, 252 U.S. 189 (1920), and *Miles* v. *Safe Deposit & Trust Co.*, 259 U.S. 247 (1922), for the proposition that stock options, like stock dividends and stock rights, are not taxable because the taxpayer's economic position does not change. We find no merit in this argument. The Supreme Court in *LoBue*, in bringing to an end the distinction between proprietary and compensatory stock options, held that stock options confer a substantial economic benefit upon the taxpayer, which benefit is taxable as compensation for personal services under the sweeping provisions of section 22(a), I.R.C. 1939 (predecessor of sec. 61(a), I.R.C. 1954). Thus, the cases cited by petitioner have no application to the stock option area.

Based upon the foregoing, we hold that respondent correctly determined that date of exercise is the appropriate taxable event herein in accordance with the provisions of section 1.421–6(d), Income Tax Regs.

*Issue 4. Fair Market Value of the Stock at Date of Exercise*

Having established that date of exercise constitutes the appropriate taxable event, there yet remains for our decision the amount of compensation income realized by petitioner at the time of exercise.

The amount of such compensation income is measured by "the difference between the amount payable for the property and the fair market value of the property" at the time of exercise. Sec. 1.421–6(d)(1), Income Tax Regs. There is no dispute regarding the former amount. The parties have stipulated that petitioner paid the total option price of $52,500 for the MGIC and GIAI stock received upon exercise of the options. However, considerable disparity exists between the parties with respect to the latter amount. Respondent made a determination in his statutory notice that the fair market value of the stock at issue on the exercise date was $21.90 per adjusted share; whereas, petitioner takes the position that the fair market value of the stock on that date did not exceed $11 or $12 per adjusted share.

Thus, it is our task to determine the fair market value of the MGIC and GIAI stock received by petitioner on September 28, 1960 (the date of exercise). This is a factual question to be determined from a consideration of all the facts and circumstances of the instant case. *LeVant* v. *Commissioner*, 376 F. 2d 434, 442 (C.A. 7, 1967), affirming in part and reversing in part 45 T.C. 185 (1965).

In support of his determination of a per share price of $21.90, respondent relies almost exclusively upon the selling price of MGIC units between third parties on or about the exercise date, and he argues that such selling prices constitute the best evidence of the fair market value of the stock at issue, citing *Fitts' Estate* v. *Commissioner*, 237

F. 2d 729 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court; *Estate of Leonard B. McKitterick*, 42 B.T.A. 130 (1940); *Zerweck Jewelry Co.*, a Memorandum Opinion of this Court; and section 20.2031–2(b), Estate Tax Regs. The record herein does contain the ledger account of Marshall J. Palakow with Bache & Co., a brokerage firm, showing sales of 73 units of MGIC stock on September 13 and 14 of 1960 at the price of $1,000 per unit or an adjusted per share price of $21.74 (after all stock splits). The record also reflects two transactions on September 16, 1960 (12 days prior to the exercise date), wherein Marshall J. Palokow transferred 60 units of MGIC (240 shares of MGIC, $10 par value, and 60 shares of GIAI, $5 par value) to Gerald Friedman, and an additional 25 units (100 shares of MGIC, $10 par value, and 25 shares of GIAI, $5 par value) to Milton Soref, both transactions occurring at the per share price of $21.66 (adjusted for all stock splits). Also in the record before us is the ledger account of Fredric L. Gale at Bache & Co. indicating sales on September 30, 1960 (2 days after date of exercise), of 70 units of MGIC at $1,050 per unit, or $22.83 per adjusted share (after all stock splits). Finally, the record shows that the price of MGIC stock was first quoted in the "Milwaukee Sentinel" on October 20, 1960, at a bid price of 26 and asked price of 28, and that the price declined through the end of that month to a bid of 23½ and an asked price of 25½.

While the foregoing selling prices are obviously relevant to a determination of the fair market value of the stock at issue, we do not feel that sole reliance should be placed upon such relatively isolated prices to the exclusion of other important evidence of record. The authority cited by respondent for the proposition that selling price is the best evidence of fair market value of the stock is predicated upon the existence of an active market in the stock to be valued. Such is not the case herein. The stock involved herein was not listed on any stock exchange, and bid and asked quotations for such stock did not become available until the "Milwaukee Sentinel" first published same approximately 3 weeks after the exercise date. Moreover, insofar as the record shows, only a limited number of transactions in MGIC units took place among third parties on or around the exercise date. For example, as of the date of exercise, a total of 111,284 shares of MGIC, $10 par value, and 27,289 shares of GIAI, $5 par value, were issued and outstanding. However, the record shows that during the entire month of September 1960 there were 68 transactions between third parties involving the sale of only 738 units of MGIC (2,952 shares of MGIC, $10 par value, and 738 shares of GIAI, $5 par value) with the prices for only a few of these transactions being available.

These sales of small lots of MGIC units do not by themselves conclusively establish the fair market value of the 800 units of MGIC stock received by petitioner on the exercise date. *Robertson* v. *Routzahn*, 75 F. 2d 537, 539 (C.A. 6, 1935), affirming 1 F. Supp. 355 (N.D. Ohio 1932). Where an open and active market for the stock to be valued is lacking, it becomes necessary to consider other factors bearing upon the question of fair market value. As the court said in *Helvering* v. *Maytag*, 125 F. 2d 55, 63 (C.A. 8, 1942):

> Where, as in this case, the taxpayer affirmatively shows that a block of listed stock to be valued is very great in comparison with the amounts of the stock which have been traded in on the exchange where it is listed, that the block of stock could not be sold on such market at its quoted prices within a reasonable time by skilled brokers following prudent practices for liquidation and that the true value of the block of stock is in fact different from the price quotations, then the taxpayer is entitled to have all other proper evidence of the value of the block of stock considered together with the market quotations.

Petitioner's expert (Inbusch) did consider factors in addition to selling price, and in so doing, reached the conclusion that the stock received by petitioner had a fair market value on the date of exercise in the amount of $11 or $12. In his explanation of this fair market value determination, Inbusch stated that any attempt by petitioner to sell the stock he received at exercise would result in a discount for a variety of previously enumerated reasons; i.e., petitioner's large holdings; stock was not registered with SEC; petitioner was insider; registration would be expensive and impractical; and private placement would be difficult.

There is merit in Inbusch's testimony when considered, as it was intended, in the context of the fair market value determination involved herein. Indeed, respondent's own expert witness (Lorie) stated that, without endorsing petitioner's precise valuation of $11 or $12 per adjusted share, he agreed with his conclusion that petitioner would have to sell the stock at a discount. In determining the fair market value of the stock at issue, we have accorded considerable weight to Inbusch's testimony. Nevertheless, we cannot accept Inbusch's exact fair market value determination because we feel that he has exaggerated the difficulty petitioner would encounter in marketing his stock and has failed to consider certain countervailing evidence tending to minimize the discount petitioner would sustain.

Inbusch apparently failed to consider the possibility that petitioner would be able to effect intrastate sales of the stock. The stock was apparently registered with the State of Wisconsin, and there was demand for such stock in the Milwaukee area as evidenced by the bid and asked quotations appearing in the "Milwaukee Sentinel" approximately 3 weeks after the exercise date. The record confirms

that the transactions in MGIC stock were more frequent on or around the exercise date than at any previous time. Moreover, at least one firm, Bache & Co., was acting as a stockbroker for MGIC stock in September 1960. Thus, even though the 800 units of MGIC stock received upon exercise by petitioner was large in relation to the volume of MGIC stock traded between third parties (738 units during September 1960), we believe he could have minimized any resulting discount by means of an orderly liquidation of his shares through private placements and intrastate sales carried out by skilled brokers.

Based upon the foregoing, and using our best judgment after a thorough consideration of all of the evidence of record, we find the fair market value of the stock received by petitioner on September 28, 1960, to be $18.50 per adjusted share. Accordingly,

*Decision will be entered under Rule 50.*