Kenneth R. Swenson and Leora P. Swenson v. Commissioner.
Swenson v. Commissioner
Docket No. 4443-69.
United States Tax Court
T.C. Memo 1971-88; 1971 Tax Ct. Memo LEXIS 242; 30 T.C.M. (CCH) 357; T.C.M. (RIA) 71088; April 28, 1971, Filed *242 Petitioner was granted an option to purchase stock of a corporation, by the corporation's sole stockholder. Petitioner did not exercise the option, but he did transfer it in an arm's-length transaction. Held, the gain on the transfer is not capital gain since the option was granted to secure better services. Commissioner v. LoBue [56-2 USTC 9607], 351 U.S. 243 (1956); held further, petitioner is taxable at the time of the transfer and not at the time of the grant since the option did not have a readily ascertainable fair market value when granted. Sec. 1.421-6, Income Tax Regs.
*243 Rodney H. Busey, Century Plaza Bldg., Wichita, Kan., for the petitioners. Bruce A. McArdle, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in petitioners' Federal income tax for calendar year *244 1966 in the amount of $3,948.64. The issue for our decision is whether petitioner Kenneth R. Swenson realized ordinary income or 358 longterm capital gain with respect to amounts received from the transfer of his interest in a stock option. Findings of Fact Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Wichita, Kansas at the time the petition herein was filed. (Hereinafter the designation petitioner shall refer solely to Kenneth R. Swenson.) They filed joint Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue at Wichita, Kansas. Midland Metalcraft, Inc. (hereinafter sometimes referred to as Midland), is a corporation, incorporated under the laws of the state of Kansas on March 1, 1964. At all times pertinent hereto, Midland's capital consisted only of common stock, of which 10,000 shares, with a par value of $10 per share, were authorized. 3,000 shares thereof were issued and outstanding. The equity capitalization of Midland consisted of $30,000, which was received by the corporation in exchange for the aforementioned *245 3,000 shares of its stock which were issued to Louis E. Weiss (hereinafter sometimes referred to as Weiss). At all times from the date of incorporation, March 1, 1964, through and including January 5, 1965, these 3,000 outstanding shares of Midland stock were owned and controlled by Weiss. Midland's stock was not registered with the Securities and Exchange Commission. There was not a single share of Midland stock sold to any party by either the corporation or by Weiss from date of Midland's incorporation throughout the period here involved, inclusive of January 31, 1966. Neither Midland nor Weiss ever made any offer to sell Midland stock to any third party from date of Midland's incorporation throughout the period here involved, inclusive of January 31, 1966. At all times pertinent hereto, Weiss was president and general manager of Midland. Midland was involved in the manufacture and fabrication of metal shelving, commercial display cases and related items. Petitioner and Weiss had been business associates from about 1946 to sometime in the 1950's. On June 19, 1964, Midland, through its president, Weiss, transmitted the following letter to petitioner: 19 June, 1964 Kenneth *246 R. Swenson Oil and Gas Leasing Service 114 West Pine Garden City, Kansas
Kenny, I am pleased that you are seriously considering returning to Wichita and joining Midland. I want to put down some of our past discussions and would welcome any additions or corrections you may have. It is my understanding that we would employ you at Midland at the rate of $750 per month plus 10 per cent of the net profits before taxes. I probably should point out that it has been our policy to take depreciation as fast as Internal Revenue will allow, and in addition, to expense just as much as our accountants think Internal Revenue would allow. We did not discuss when we would pay the 10 per cent, but I suppose it should be an annual ritual after we have closed each year. We are now on a calendar year basis. I would expect to give you an option of 1/3 of my stock (1,000 shares at $10 par) to extend over a five-year period subject only to your remaining with Midland. Should you exercise your option and then leave Midland, I would want first chance to buy back your Midland stock. I would expect to make you a director and an officer of the company. I would expect to turn over to you just as *247 fast as we could do it all details here in Wichita. I would like to concentrate my efforts on developing sales. As long as we continue to sell industrial steel shelving you would necessarily have sales problems, particularly in my absence. I suspect there would be much overlapping of general management duties until we worked out a clear-cut division of responsibilities. Sometime, I would guess within the next year, we would want to set up a buy-sell agreement covered by life insurance that would enable either of us to buy the other completely out should anything happen to either of us. As you know, my principal concern is to have someone here who can run the entire operation in my absence, and who could also, in the event of my death or incapacitation, take over. I believe you are that man. Please feel free to make any comments you care to. Sincerely, MIDLAND METALCRAFT, INC.
Louis E. Weiss President 359359 Petitioner began employment with Midland on September 1, 1964. He was a management employee of Midland and also acted as a corporate officer, holding the office of vice president. Petitioner acted as Midland's general manager in Weiss's absence. His employment *248 and duties were performed on a full-time basis from September 1, 1964, throughout the period here involved, and from that date, petitioner was employed solely by Midland. On January 5, 1965, petitioner and Weiss, individually, entered an agreement entitled "Stock Option Agreement." The agreement stated as follows: THIS AGREEMENT made and entered into this 5 day of January, 1965, be and between LOUIS E. WEISS, an individual, hereinafter called WEISS,and KENNETH R. SWENSON, an individual, hereinafter called SWENSON. WITNESSETH: WHERAS, WEISS is the sole stockholder in the corporation known as MIDLAND METALCRAFT, INC. whose principal office is in Wichita, Sedgwick County, Kansas, and is the managing officer of said corporation, and that he is of the opinion that the best interests of the corporation will be advanced by granting an incentive to SWENSON, upon whose judgment, iniative [sic] and efforts the corporation is dependent for its successful operation, to acquire stock ownership in the corporation. NOW, THEREFORE, for and in consideration of the mutual promises and the mutual covenants hereinafter set forth, the parties hereto hereby enter into a stock option agreement *249 which is as follows: 1. WEISS hereby grants to SWENSON, as a matter of incentive and to encourage stock ownership in the corporation, and not in lieu of profit, any increase in salary, or other compensation for his services, the right and option to purchase one thousand (1,000) shares of the capital stock of the corporation which is owned by WEISS at this time at Ten Dollars ($10.00) par value per share. 2. The aforesaid option, or any part thereof, shall be exercised by the giving of written notice of exercise to WEISS specifying the number of shares to be purchased and accompanied by payment in full for the number of shares purchased, and such exercise shall be effective upon receipt of such written notice and payment to WEISS. Said option shall be so exercised within five (5) years from the date of this stock option agreement, and not otherwise, and provided that at the time the aforesaid option or any part thereof is exercised SWENSON is still in the employ of the corporation known as MIDLAND METALCRAFT, INC.
3. The said option and the rights conferred by this agreement by WEISS shall not be transferred except by will or by the laws of descent and distribution and during *250 the lifetime of the employee and the period of time as hereinbefore set out. 4. Upon the termination of the employment by the corporation of SWENSON for any reason other than SWENSON'S death, this option will terminate to the extent that it has not previously been exercised unless such termination of employment shall be because of ill health which causes total disability. 5. In the event SWENSON elects to purchase or acquire any part or portion of the stock so optioned, and at some time after such acquisition leaves the employment of MIDLAND METALCRAFT, INC.WEISS shall have the first right of refusal to repurchase said stock or any part thereof at the then book value, it being understood that the book value shall be ascertained by taking the capital stock outstanding plus the retained earnings. 6. In the event of a merger, consolidation, reorganization, recapitalization, stock dividend or other change in corporate structure of the capitalization effecting the corporation know as MIDLAND METALCRAFT, INC.WEISS hereby agrees to take into consideration this option agreement as it would effect any change in corporate structure of MIDLAND METALCRAFT, INC.
THIS AGREEMENT shall be *251 binding upon and inure to the benefit of the parties hereto and any successors to the business of the company. IN WITNESS WHEREOF, the parties hereto have hereunto set their respective hands and seals the day and year first above written. WEISS: /Signed/ Louis E. Weiss Louis E. Weiss SWENSON: /Signed/ Kenneth R. Swenson Kenneth R. Swenson Petitioner never exercised, in whole or in part, his rights under the January 5, 1965 "Stock Option Agreement," and no shares of Midland stock were ever acquired by him. Petitioner's rights under the "Stock Option Agreement" of January 5, 1965 were assigned, transferred, or conveyed to Weiss 360 in consideration of $40,000 on January 12, 1966. Petitioner did not report on his 1965 Federal income tax return any income with respect to the rights obtained pursuant to the "Stock Option Agreement" granted him on January 5, 1965. On his 1966 return, petitioner treated the $40,000 received from Weiss as a long-term capital gain on the sale or exchange of a capital asset. The Commissioner determined that the amount received was taxable as ordinary income rather than as long-term capital gain and adjusted petitioners' taxable income *252 accordingly. Opinion The issue confronting us herein is whether petitioner realized ordinary income or longterm capital gain when he transferred his rights in a stock option for $40,000. Petitioner advances two basic contentions in support of his position that he is entitled to capital gains treatment. His first line of attack is that since Weiss[1] did not intend to confer an economic benefit to petitioner to secure better services but rather to enable petitioner to attain an ownership or proprietary position, the gain is entiled to capital gain treatment. Commissioner v. LoBue, 351 U.S. 243 (1956). With this we cannot agree. As the Supreme Court clearly stated: When assets are transferred by an employer to an employee to secure better services they are plainly compensation. Commissioner v. LoBue, supra, at 247. Obviously, the receipt of stock places *253 one in a position of owner or proprietor, whether it be by outright purchase or through some other means, as is the case here. However, petitioner's ascension to the lofty perch of ownership was not to be immediate. He was given the opportunity to acquire his ownership because Midland was relying on his "judgment, iniative [sic] and efforts * * * for its successful operation." It is hard to accept petitioner's contention that he was granted the option for reasons other than his rendering better services to Midland. Plainly, the only reason for the option was in consideration for his services. And that certainly places this option within the purview of Commissioner v. LoBue, supra. Petitioner's second line of attack is that the option had a readily ascertainable value at the time of its grant and therefore its taxability was to be determined at that time. The significance of a readily ascertainable value for the option is paramount herein since both parties agree that the option granted to petitioner is a nonstatutory stock option. Since this is the case, the governing principles relative to the taxability of such an option are contained in section 1.421-6 of the *254 regulations which provide as follows: Sec. 1.421-6(a)(3). If an option to which this section applies has a readily ascertainable fair market value when granted, no amount is includible in gross income under this section as compensation by reason of the transfer or exercise of such option, irrespective of whether such value was included in income for the taxable year in which the option was granted, and any deduction which is allowable as a result of the granting of such option is allowable only for the taxable year in which the option is granted. Thus, if an option having a readily ascertainable fair market value to which this section applies was granted in a taxable year for which an assessment of deficiency was barred at the time of the adoption of paragraph (c) of this section as a Treasury decision, no amount is includible in gross income under this section as compensation by reason of the transfer or exercise of such option. However, if there is a determination to which the rules of sections 1311-1314 apply, there may be an adjustment for the taxable year in which the option was granted. * * * (c) Options with a readily ascertainable fair market value. (1) If there is granted *255 an option to which this section applies and which has a readily ascertainable fair market value (determined in accordance with subparagraphs (2) and (3) of this paragraph) at the time the option is granted, the employee in connection with whose employment such option is granted realizes compensation at such time in an amount equal to the excess, if any, of such fair market value over any amount paid for the option. If an option to which this section applies does not have a readily ascertainable fair market value at the time the option is granted, the time when the compensation is realized and the amount of such compensation shall be determined under paragraph (d) of this section. 361 (2) Although options may have a value at the time they are granted, that value ls ordinarily not readily ascertainable unless the option is actively traded on an established market. If an option is actively traded on an established market, the fair market value of such option is readily ascertainable for purposes of this section by applying the rules of valuation set forth in § 20.2031-2 of this chapter (the Estate Tax Regulations). (3)(i) When an option is not actively traded on an established *256 market, the fair market value of the option is not readily ascertainable unless the fair market value of the option can be measured with reasonable accuracy. For purposes of this section, if an option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist: (a) The option is freely transferable by the optionee; (b) The option is exercisable immediately in full by the optionee; (c) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price)which has a significant effect upon the fair market value of the option or such property; and (d) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of this subparagraph. (ii) The fair market value of an option includes the value attributable to the option privilege and may include the value attributable to the right to make an immediate bargain purchase of the property subject to the option. If the option provides an option *257 price which is less than the fair market value of the property subject to the option at the time it is granted, an immediate gain may be realized by exercising the option at the bargain price and selling the property so acquired. However, irrespective of whether there is a right to make an immediate bargain purchase of the property subject to the option, the fair market value of the option includes the value of the option privilege. The option privilege is the opportunity to benefit at any time during the period the option may be exercised from any appreciation during such period in the value of the property subject to the option without risking any capital. Therefore, the fair market value of an option is not merely the difference which may exist at a particular time between the option price and the value of the property subject to the option but also includes the value of the option privilege. Accordingly, for purposes of this section, the fair market value of the option is not readily ascertainable unless the value of the option privilege can be measured with reasonable accuracy. In determining whether the value of the option privilege is readily ascertainable, and in determining *258 the amount of such value when such value is readily ascertainable, it is necessary to consider - (a) Whether the value of the property subject to the option can be ascertained; (b) The probability of any ascertainable value of such property increasing or decreasing; and (c) The length of the period during which the option can be exercised. (d) Options without a readily ascertainable fair market value. If there is granted an option to which this section applies, and if the option does not have a readily ascertainable fair market value at the time it is granted, the employee in connection with whose employment the option is granted is considered to realize compensation includible in gross income under section 61 at the time and in the amount determined in accordance with the following rules of this paragraph: * * * (2)(i) If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect on its value, the employee realizes compensation at the time such restriction lapses or at the time the property *259 is sold or exchanged, in an arm's length transaction, whichever occurs earlier, and the amount of such compensation is the lesser of - (a) The difference between the amount paid for the property and the fair market value of the property (determined without regard to the restriction) at the time of its acquisition, or (b) The difference between the amount paid for the property and either its fair market value at the time the restriction lapses or the consideration received upon the sale or exchange, whichever is applicable. If the property is sold or exchanged in a transaction which is not at arm's length before the time the employee realizes compensation in accordance with this subdivision, any amount of gain which the employee realizes as a result of such sale or exchange is includible in gross income at the time of such sale or exchange, but the amount includible in 362 gross income under this subdivision at the time of the expiration of the restriction or the sale or exchange at arm's length shall be reduced by the amount of gain includible in gross income as a result of the sale or exchange not at arm's length. (ii) The provisions of subdivision (i) of this subparagraph *260 may be illustrated by the following examples: * * * Example (3). Assume that, pursuant to the exercise of an option not having a readily ascertainable fair market value to which this section applies, an employee acquires stock subject to the sole condition that, if he desires to dispose of such stock during the period of his employment, he is obligated to offer to sell the stock to his employer at its fair market value at the time of such sale. Since this condition is not a restriction which has a significant effect on value, the employee realizes compensation upon acquisition of the stock. Example (4). Assume, in example (3), that the employee is obligated to offer to sell the stock to his employer at its book value rather than at its fair market value. Since this condition amounts to a restriction which has a significant effect on value, the employee does not realize compensation upon acquisition of the stock, but he does realize such compensation upon the lapse of the restriction, such as, for example, his death or the termination of his employment. (3) If the option is not exercised by the person to whom it was granted, but is transferred in an arm's length transaction, *261 the employee realizes compensation in the amount of the gain resulting from such transfer of the option, and such compensation is includible in his gross income in accordance with his method of accounting. * * * If we apply the provisions of section 1.421-6 to the case herein the following points are clear. If the option granted petitioner on January 5, 1965 had on that date a readily ascertainable fair market value, then, petitioner realized "compensation" income in 1965 in an amount equal to the excess of the fair market value of the option at date of grant over the option exercise price. Consequently, if the option had a readily ascertainable fair market value at grant, petitioner realized no "compensation" income by reason of the January 12, 1966 transfer of his option rights. However, the amount includable as "compensation" income in 1965 would affect petitioner's basis in the option, and thereby, the amount of capital gains income resulting upon transfer in 1966. Again, relating section 1.421-6 of the regulations to the case herein, if the option granted petitioner did not have a readily ascertainable fair market value at date of grant, "compensation" income, taxable at ordinary *262 rates, was realized upon transfer in 1966, rather than at grant, in 1965. The facts reveal that neither the option granted petitioner, nor the stock to be acquired thereby, were actively traded on any established market. The only sale of Midland stock had been the initial purchase by Weiss at the time of incorporation. This absence of active trading brings into play the provisions of section 1.421-6(c)(3)(i) of the regulations quoted above. This provision states that in a situation as we have before us, an option does not have a readily ascertainable fair market value when granted unless the taxpayer can show all of the following: (a) The option is freely transferable by the optionee; (b) The option is exercisable immediately in full by the optionee; (c) The option or the property subject to the option is not subject to any restriction or condition * * * which has a significant effect upon the fair market value of the option or such property; and (d) The fair market value of the option privilege is readily ascertainable * * *. By the terms of the option itself it is readily apparent *263 that all four of the required conditions are not satisfied; in fact all but the second condition are unsatisfied. As to the first condition - free transferability. The third paragraph of the option restricts the transfers by petitioner to those "by will or by the laws of descent and distribution." The patent character of this restriction does not warrant further comment. With regard to the third condition - restrictions bearing on the value of the option or the property subject thereto. Again the option agreement reveals the disqualifying item. The right to exercise the option was limited in time to that period during which petitioner was in the employ of Midland. Petitioner's rights were subject to the will of Weiss, if he so desired he could terminate petitioner's employment and 363 petitioner's rights would be valueless. [2] Also, the portion of the option agreement concerning Weiss' right of first refusal if petitioner should desire to sell any stock obtained under the option, is, we think, a significant restriction affecting the value of the stock. [3]
*264 Footnotes
1. The applicable section of the regulations herein, 1.421-6(a)(1), does not distiguish between an option granted by a corporate employer or one granted by a stockholder thereof; and neither do we.↩
2. We also view the restriction of transferability to disqualify the option under this condition also. ↩
3. See Examples (3) and (4) of section 1.421-6 (d)(2)(ii) of the regulations.e Lastly we come to the fourth condition, the value of the option privilege itself. This value is of importance because it is a portion of the value of the option. For the option to have a readily ascertainable fair market value, the value of the option privilege must be capable of reasonably accurate measurement. The record indicates that an inexact, time-consuming complex analytical determination based upon the analytically determined value of the stock of Midland would be necessary to arrive at any estimated date of grant value of the option and option privilege acquired by petitioner. The Commissioner offered an expert witness having over a decade of experience in the valuation and analysis of stocks, options and securities. His opinion was that neither the option, nor the option privilege had a readily ascertainable fair market value at the date of the grant of the option. In reaching this conclusion, he considered the following factors among others: the marketability of the stock; the history of the corporation, particularly its earning record and dividend policies; the financial structure and stability of the company; the corporate management and sales organization; the corporate good will among its customers and associates; the general state of the economy; the growth potential of the industry group in which the corporation operates; the growth potential of the particular corporation; and the book value. See M.P. Frank, 54 T.C. 75 (1970), on appeal (C.A. 7, May 28, 1970). He also took into account the fact that the stock was not registered with the Securities and Exchange Commission. This has been considered to substantially affect a stock's marketability. See Ira Hirsch, 51 T.C. 121 (1968). It seems reasonable to conclude that a stock's value may be ascertained with reasonable accuracy if a prospective buyer or seller can obtain a price without unreasonable delay in the financial market place. If the value of the stock cannot be so obtained, it would appear to have no marketrelated value. This, of course, does not mean that a value cannot be determined for the stock, but it does mean a layman could not obtain the value of the stock other than by employing a securities analyst for the purpose of making an appraisal. Such appraisal would be complex and timeconsuming. The value determined in such a manner would be based upon many analytical computations. These computations would themselves consider many inexact factors, such a the corporation's growth potential and good will. Furthermore, the fair market value of the option and option privilege are directly related to the value of the underlying stock. Consequently, an inexact, timeconsuming, complex analytical determination based upon a derived value of the stock would be necessary to arrive at an estimated date of grant value of the option and option privilege. The value of such an option cannot be considered readily ascertainable. In M. P. Frank, supra at p. 94, we said: Surely, it cannot be considered unreasonable to require reasonable accuracy in the valuation of stock options. To hold otherwise would be to encourage estimates of fair market value of such rights on the basis of pure speculation and surmise. In light of the foregoing we cannot say that the value of the option privilege was readily ascertainable with reasonable accuracy at the date of the grant. Further, we cannot hold that the value of the option granted to petitioner had a fair market value when granted that was readily ascertainable. Decision will be entered for the respondent. ↩