ANCEL GREENE AND COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85184. Filed April 23, 1962.

*Edith DeBusk, Esq.*, for the petitioner.
*Charles B. Sklar, Esq.*, for the respondent.

### OPINION.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for its fiscal years ended March 31, 1956, 1957, and 1958, in the amounts of $1,647.66, $643.99, and $1,075.06, respectively. For its fiscal years ended March 31, 1956, and March 31, 1957, petitioner claims overpayments in the amounts of $595.55 and $420.63, respectively.

The issues for decision are:

(1) Whether any portion of the amounts withheld in the taxable years here involved by the Federal National Mortgage Association from the purchase prices of mortgages sold to it by petitioner and

applied as a subscription to capital stock of that association in accordance with its requirements and its contracts with petitioner is not includible in or is deductible from petitioner's income.

(2) Whether the shares of common stock in the Federal National Mortgage Association received by petitioner from that association in accordance with the contracts requiring subscriptions to the stock upon purchase by the association of mortgages were capital assets at the time of petitioner's sale thereof, and if so, the amount of capital gain or loss in the year of sale.

All of the facts have been stipulated and are found accordingly.

Petitioner is and at all times pertinent hereto has been a corporation organized and existing under the laws of the State of Texas with its principal place of business in Waco, Texas. It keeps regular books of account on a cash basis and prepares its Federal income tax returns on the basis of a fiscal year ended March 31. Its returns for the fiscal years ended March 31, 1956, 1957, and 1958, were timely filed with the district director of internal revenue at Austin, Texas.

During the years here involved petitioner was at all times engaged in the business of buying, selling, and servicing mortgages on real estate. During these taxable years it sold to the Federal National Mortgage Association (hereinafter referred to as FNMA) mortgages with total unpaid balances of $366,227.48, $421,237.91, and $669,-909.94, respectively. The contracts pursuant to which these sales were made provided in part as follows:

2. The purchase price shall be an amount equal to ____ percent [1] of the outstanding principal balance of the mortgage at the end of the day immediately preceding that of the date of the voucher * * *

\* \* \* \* \* \* *

4. The Seller shall pay to the Purchaser at the time of disbursement, and hereby authorizes the Purchaser at that time to deduct from the amount to be disbursed by reason of the payment of the purchase price, the following:

(a) A purchase and marketing fee in the amount of ____ percent [1] of the outstanding principal balance of the mortgage at the cut-off time, and

(b) A subscription to the capital stock of the Purchaser in the amount of 3% [1] of the outstanding principal balance of the mortgage at the cut-off time.

FNMA as presently constituted was created by Act of Congress on July 1, 1948 (ch. 784, sec. 1, 62 Stat. 1207), and rechartered on August 2, 1954 (ch. 649, title II, sec. 201, 68 Stat. 612, 12 U.S.C. sec. 1716), to establish in the Federal Government a secondary market facility for home mortgages. It is authorized to make commitments to purchase and to purchase home mortgages which are insured under the National Housing Act, as amended, or which are guaranteed under the Servicemen's Readjustment Act of 1944, as amended, subject to certain conditions, limitations, and restrictions.

---

[1] The percentage amounts varied from contract to contract.

One condition of purchase is that the seller of a mortgage to FNMA shall "make payments of non-refundable capital contributions" equal to a prescribed percentage of the unpaid principal amounts of the mortgage at the time of purchase. This percentage is determined by FNMA and during the periods here involved was as follows: From November 1, 1954, to August 9, 1956, 3 percent; from August 9, 1956, to September 21, 1956, 2 percent; from September 21, 1956, to January 5, 1957, 1 percent; and from January 5, 1957, to February 3, 1961, 2 percent.

On the date of the sale the seller receives in cash the agreed percentage of the balance due on the mortgage less the prescribed percentage allocable to capital contributions and less the cost of Federal documentary tax stamps, which must be affixed when the stock is issued. On the first day of the following month there is issued to the seller common stock of FNMA with a par value of $100 per share in an amount equivalent to the total deductions for capital contributions on loans purchased during the preceding month. If such amount is not an even multiple of $100, the excess is carried forward and credited to stock to be issued to the seller in subsequent months.

There was a market for FNMA stock in the years 1955 through 1958 but the market value varied during this period of time from month to month from a low of $40.50 to a high of $63. During its fiscal years ended March 31, 1956, 1957, and 1958, petitioner's capital contributions to FNMA totaled $10,986.82, $5,710.02, and $12,805.79, respectively, for which it was issued stock having a par value of $10,900, $5,700, and $12,900, respectively. The total market value of such stock computed by using the market price of the various shares of stock during the month in which such shares were issued was $5,624.97, $2,806.74, and $6,960.38 for its fiscal years ended March 31, 1956, 1957, and 1958, respectively. As of March 31, 1958, petitioner had a credit of $2.63 as a capital contribution for which stock was unissued as of that date.

On April 16, 1957, petitioner sold 100 shares of FNMA stock, of which 56 shares had been held by it for more than 6 months, 49 of such shares having been held for more than 15 months. In January 1958 petitioner sold 50 shares of FNMA stock, of which 17 shares had been held for over 6 months and the remaining shares for less than 6 months. As of March 31, 1958, petitioner owned 145 shares of FNMA stock of which 12 shares had been held for 32 months, 40 shares for 29 months, 8 shares for 24 months, 6 shares for 12 months, 18 shares for 11 months, and 22 shares for 10 months. Petitioner received dividends on the FNMA stock held by it.

Petitioner was not a dealer in corporate stock during the years here involved and was not otherwise engaged in the trade or business

of buying or selling corporate stock. The FNMA stock which petitioner owned was not held by it for sale to customers in the ordinary course of its business.

During its fiscal years ended March 31, 1956 and 1957, and until June 1957, FNMA stock was carried on petitioner's books in an account containing investments in stocks and bonds. In June 1957 the total cost of petitioner's unsold FNMA stock was removed from the general stock and bond account on its books and set up in a separate account therein entitled "Stocks and bonds—Federal National Mortgage Association."

In computing its taxable income on its Federal income tax return for each of the years here involved petitioner deducted as an ordinary and necessary expense of doing business the difference between the amount of its capital contributions to FNMA for stock acquisitions during the years and the yearly average market value of an equivalent amount of FNMA stock. The deductions thus arrived at were $5,492.20, $2,227.85, and $4,668.55 for its fiscal years ended March 31, 1956, 1957, and 1958, respectively.

Respondent in his notice of deficiency disallowed the claimed adjustments in each of petitioner's fiscal years with the following explanation:

(a) It is determined that the payments made by you for common stock of the Federal National Mortgage Association must be capitalized. Since the stock is not an inventory item or an item held by you for sale to customers in the ordinary course of business, it may not be valued at the lower of cost or market but must be valued at cost.

It is petitioner's position that the consideration it received upon the sale of its mortgages to FNMA consisted of cash and securities and that, therefore, the income realized by it from each such transaction was the amount of the cash received plus the fair market value of the securities (FNMA stock) received in the year of issue. Petitioner further contends that all the FNMA stock held and disposed of by it was property held for resale and therefore was not a capital asset within the meaning of section 1221 of the Internal Revenue Code of 1954, and that the losses resulting from the sale of such stock are ordinary losses deductible in full in computing its taxable income.

Respondent takes the position that the contracts between petitioner and FNMA provided for two separate transactions; one, the purchase of the mortgage by FNMA, and two, the capital contributions by petitioner, and that therefore the FNMA capital stock received by petitioner was a capital asset with a cost basis to petitioner of $100 per share. Respondent thus argues that the loss upon the sale of the FNMA stock constituted a capital loss represented by the difference in the selling price of the stock and the basis thereof at $100 per share.

Both parties contend that the legislative history of sections 162(d) and 1054 of the Internal Revenue Code of 1954 support their positions. The legislative history of these sections is set out and discussed in some detail in our recent decision in *McMillan Mortgage Co.*, 36 T.C. 924 (1961). As noted therein, the House Committee Report (H. Rept. No. 1662, 86th Cong., 2d Sess. (1960), 1960-2 C.B. 816) stated:

In making this statutory amendment, however, your committee intends no inferences to be drawn as to the tax treatment accorded FNMA stock before the enactment of this provision.

Therefore, in this case as in *McMillan Mortgage Co.*, *supra*, we draw no conclusions from these amendments.

Considering the facts of this case, we conclude as we did in *McMillan Mortgage Co.*, *supra*, that petitioner's contracts with FNMA were not severable and that they provided, as petitioner contends, for the receipt by it of cash and stock. Cf. *Schumacher Mortgage Co.* v. *United States*, (W.D. Tenn.)[1] an unreported opinion decided May 27, 1960, cited in *McMillan Mortgage Co.*, *supra* at 933, wherein the conclusion was reached that the exchange of cash and stock for mortgages under contracts identical to those here involved constituted a single and inseparable transaction.

We hold that petitioner is required to include in income in each of its fiscal years here involved as receipts from mortgages sold to FNMA the cash receipts plus the fair market value of the FNMA stock issued to it at the date of the issue of such stock. The latter amounts are as set forth in our findings, $5,624.97, $2,806.74, and $6,960.38 for its fiscal years 1956, 1957, and 1958, respectively.

While the facts in the instant case with respect to the requirement of FNMA that the stock be purchased, the provisions of the contracts with respect to the purchase, and the issuance of FNMA stock are identical except as to amounts and dates with those in *McMillan Mortgage Co.*, *supra*, and *Schumacher Mortgage Co.* v. *United States*, *supra*, the facts with respect to the carrying of the stock on petitioner's accounts and the holding of the stock differ in the instant case from those involved in the *McMillan Mortgage Co.* and *Schumacher Mortgage Co.* cases. In *McMillan Mortgage Co.*, as well as in *Schumacher Mortgage Co.*, the taxpayer involved held the FNMA stock for relatively short periods of time and with no intent to hold such stock as an investment. In the instant case the petitioner held substantial portions of its FNMA stock for periods in excess of a year and a half and at the end of the last fiscal year here involved was still holding some stock which had been held by it over 2½ years. The evidence does not disclose the reason why petitioner held this stock, and because

[1] 5 A.F.T.R. 2d 1738, 60-2 U.S.T.C. par. 9524.

of failure of proof in this regard, we assume against petitioner that this stock was held by it as an investment either for the receipt of the dividends paid to it by FNMA or in hope that the market price of the stock would increase over what it had been at the time petitioner received the stock.

In *McMillan Mortgage Co.*, *supra*, in holding that the stock held by the taxpayer there involved was not a capital asset within the meaning of section 1221 of the Internal Revenue Code of 1954, we relied on a number of cases in which taxpayers have been required to purchase assets in connection with their business and had immediately disposed of such assets. These cases are distinguishable from the instant case on the same basis as they were distinguished in *Gulftex Drug Co.*, 29 T.C. 118 (1957), affirmed per curiam 261 F. 2d 238 (C.A. 5, 1958), wherein we stated:

The short holding period in the four cited cases was consistent with the contention that at the time of the purchase and continuing to the time of sale the sole purpose was to acquire whiskey. However, the purpose for which stock is owned and held can change, and the purpose at the time of sale is determinative of the effect of the sale for tax purposes. *Carl Marks & Co.*, 12 T.C. 1196, 1202; *C. E. Mauldin*, 16 T.C. 698, 707, affd. 195 F. 2d 714; *Philber Equipment Corporation*, 25 T.C. 88, 92, reversed on other grounds 237 F. 2d 129; *Arthur E. Wood*, 25 T.C. 468, 474.

In *Gulftex Drug Co.*, *supra*, the stock involved had been purchased at its market price on the date of its purchase for the purpose of taking advantage of the whisky-purchasing privileges attached thereto but had been held for a period of approximately 9 years during which time dividends thereon had been paid and it was sold at the quoted market price on the date of its sale. In the *Gulftex Drug* case we held that the stock there involved was a capital asset and that the loss on its sale was a capital loss. Although no issue was raised as to the proper computation of the loss on the sale of the stock involved in the *Gulftex Drug* case, it is apparent from the facts therein that the loss was the difference in the cost of the stock to the taxpayer and its sales price. In the instant case, since the FNMA stock sold by petitioner was received as part of the consideration of the amount paid to petitioner by FNMA for mortgages sold to it, the basis to petitioner is its fair market value at the date of issuance thereof to petitioner.

We sustain respondent in his contention that the shares of FNMA stock sold by petitioner in 1957 and 1958 were capital assets and hold that the gain or loss upon such sales should be computed by using as the basis of each share of stock sold, the fair market value of such share at the date of its issue to petitioner.

*Decision will be entered under Rule 50.*