EASTERN SERVICE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 497–74.     Filed February 19, 1980.

*Robert A. Jacobs* and *Linda S. Gross,* for the petitioner.
*Larry Kars,* for the respondent.

WILBUR, *Judge:* Respondent determined a deficiency of $281,638.54 in petitioner's income tax for the taxable year 1969. Some minor adjustments have been conceded by petitioner. The remaining issue[1] for our decision is whether petitioner is entitled to all or part of a deduction of $498,512.44 under section 162(d)[2] in connection with the acquisition of certain shares of common stock of the Federal National Mortgage Association. If we find that petitioner is entitled to a deduction under section 162(d), we must then ascertain the fair market value of the stock on the date it was acquired in order to compute the amount of the deduction.

## FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulated facts and the attached exhibits are incorporated herein by this reference. A summary of the pertinent facts is set forth below.

Eastern Service Corp. (hereinafter referred to as petitioner) is a New York corporation. At the time of the filing of the petition in this case, petitioner's principal office was in Hempstead, N.Y. Petitioner filed its Federal income tax return for the taxable year 1969 with the Internal Revenue Service Center in Andover, Mass.

During 1969, petitioner was a mortgage seller-servicer. In its business, petitioner originated mortgage loans on residential properties and then sold the loans to permanent institutional investors, including the Federal National Mortgage Association

---

[1]Respondent has also contested the amount of petitioner's New York State franchise tax accrual. However, this issue turns solely on the resolution of the primary issue in the case.

[2]All section references are to the Internal Revenue Code of 1954 as in effect during the tax year in issue.

(hereinafter referred to as FNMA). After the sale, petitioner serviced the accounts of the institutional investors to whom the mortgages had been sold. Servicing an account involved collecting the monthly payments under the mortgage and remitting the funds to the proper permanent investor, taxing authorities, and insurance companies, as well as inspecting the buildings for the permanent investor. For performing these functions, petitioner received a servicing fee, which was approximately one-half of 1 percent of the mortgage principal.

Petitioner preferred to sell mortgages to permanent institutional investors other than FNMA, because only FNMA exacted a nonrefundable commitment fee, and in addition had certain stock purchase and stock retention requirements. However, petitioner, along with other mortgage sellers, turned to FNMA for mortgage funds in periods of tight credit. Because of its size and its preferred borrowing status as a federally sponsored credit agency, FNMA was able to gather funds for the mortgage market during periods of cyclical decline, when other permanent investors had a scarcity of liquid funds available for mortgage lending.

Petitioner began selling mortgages to FNMA in 1968 after it became an FNMA approved seller-servicer. During 1968 and thereafter, FNMA was the principal purchaser of mortgages originated by petitioner. Mortgages sold to FNMA typically have a 25- to 30-year term. If the home is sold and a new loan made, if the owner refinances the loan, or if the mortgage is prepaid for any reason, the mortgage will have a lesser life. For these reasons, the average life of an FNMA mortgage serviced by petitioner during 1969 was approximately 15 years.

Under the Federal National Mortgage Association Charter Act of 1954, Pub. L. 560, 68 Stat. 612, 12 U.S.C. sec. 1716 et seq. (hereinafter referred to as the FNMA Charter Act), when mortgage sellers such as petitioner sell mortgages to FNMA, they are required to make payments of nonrefundable capital contributions to FNMA measured by a percentage of the unpaid mortgage principal. For these capital contributions, mortgage sellers are issued shares of FNMA's common stock. Section 303(b) of the FNMA Charter Act, as it governed petitioner's transactions with FNMA before September 1, 1968, provided in pertinent part:

The Association shall accumulate funds for its capital surplus account from

private sources by requiring each mortgage seller to make payments of nonrefundable capital contributions, equal to not more than 2 per centum nor less than 1 per centum of the unpaid principal amounts of mortgages purchased or to be purchased by the Association from such seller * * *

Under the rules governing sales transactions entered into before September 1, 1968, after petitioner, as a seller-servicer, made the required purchases of FNMA stock, it was free to dispose of the stock. No laws, regulations, or rules prevented petitioner's immediate resale of the stock it had purchased prior to September 1, 1968, in conformity with the mandates of section 303(b) of the FNMA Charter Act.

In 1968, section 303(c) of the FNMA Charter Act was amended to require that each seller-servicer own a minimum amount of FNMA stock. The stock retention requirements added for the first time by the 1968 amendments read in pertinent part:

The corporation shall at all times require each servicer of its mortgages to own a minimum amount of common stock of the corporation, measured by its stated value. Such minimum amount shall not exceed 2 per centum, as determined from time to time by the corporation with the approval of the Secretary of Housing and Urban Development, of the aggregate outstanding principal balances of all mortgages of the corporation which have been purchased subsequent to September 1, 1968, and which are then serviced by such servicer for the corporation. * * *

Regulations promulgated by FNMA under section 303(c) of the FNMA Charter Act and incorporated into its mortgage servicing contract also required that seller-servicers retain prescribed amounts of FNMA common stock as a condition to servicing home mortgages purchased by FNMA.

In 1969, and at its earliest opportunity, petitioner sold all the FNMA stock it was required to purchase as a seller during 1968 under section 303(b) of the FNMA Charter Act. Petitioner retained only the amount of FNMA stock which FNMA servicers were required to retain under the amendments which took effect on September 1, 1968.

In 1969, petitioner originated first mortgage loans totaling $56,300,000 of which $33 million was sold to FNMA. Pursuant to the stock purchase requirements, petitioner purchased 3,701 shares of FNMA stock during 1969 for an aggregate purchase price of $498,513. Subsequently, these shares were split 4 to 1, and then were split 4 to 1, again, thus becoming 59,216 shares. For purposes of these proceedings, the parties have stipulated that the mean bid and asked price of the FNMA stock in the

over-the-counter market at all relevant times was not less than the issue price of the FNMA stock purchased by petitioner.

## OPINION

The issue before us is how to treat shares of common stock that petitioner was required to purchase and retain in order to do business with FNMA. Under section 162(d),[3] petitioner is entitled to a current deduction whenever the amount of capital contributions it is required to make in exchange for FNMA stock exceeds the fair market value of the stock on the date of issue. It is petitioner's position that because it was required to hold the stock it was issued in 1969 so long as it serviced the mortgages for FNMA, the stock is restricted stock, and therefore, a discount must be applied in order to determine its fair market value. Petitioner maintains that it is entitled to a current deduction under section 162(d) for the excess of the purchase price over the discounted fair market value of the restricted stock. Respondent contends that notwithstanding the retention requirements, no discount should be applied to the stock, and that petitioner is not entitled to a deduction under section 162(d) because the purchase price was not greater than the quoted market price of freely alienable FNMA stock on the date of issue. We agree with petitioner.

In order to make sense out of a complex business situation and a very particularized provision of the Internal Revenue Code, it is necessary to describe the applicable laws governing FNMA, the law as amended in 1968, and the enactment of section 162(d).

## I. *Background of FNMA and Section 162(d)*

Created in 1938, FNMA was originally a corporation wholly owned by the Federal Government. In 1954, under the FNMA Charter Act, it became a mixed ownership corporation of the United States. In 1968, the then-existing entity was split into two corporations, and FNMA became entirely privately owned.

---

[3]Sec. 162(d) provides:

(d) CAPITAL CONTRIBUTIONS TO FEDERAL NATIONAL MORTGAGE ASSOCIATION.—For purposes of this subtitle, whenever the amount of capital contributions evidenced by a share of stock issued pursuant to section 303(c) of the Federal National Mortgage Association Charter Act (12 U.S.C., sec. 1718) exceeds the fair market value of the stock as of the issue date of such stock, the initial holder of the stock shall treat the excess as ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.

The purpose of FNMA, as it relates to petitioner's business, is to provide supplementary assistance to the secondary market for home mortgages. FNMA puts money into the mortgage market when the supply of funds from other sources is limited. It does not make direct loans to borrowers, however. Rather, it purchases mortgages originated by other institutions, such as petitioner, who then use the proceeds of the sale to finance additional mortgage loans.

FNMA's services are generally called upon most heavily during cyclical credit squeezes as in 1966 and 1969–70. During such periods of tight credit, "mortgage bankers who rely on the secondary market for the permanent placement of their mortgage loans find the traditional sources unavailable and turn to FNMA for financing." FNMA: Background and History 7 (FNMA 1975).[4] "If the mortgage banker were unable to sell his mortgage to FNMA, he would be unable to make any further loans." However, commitment fees and other disadvantages make sales to FNMA less desirable than sales to primary investors. (FNMA, *supra* at 7.)

In 1954, when FNMA converted from total Government ownership to mixed ownership, it issued nonvoting preferred stock to the Secretary of the Treasury and nonvoting $100 par value common stock to the public. In addition, the FNMA Charter Act required that the corporation accumulate capital funds by exacting payments of "nonrefundable capital contributions" from the firms that sold mortgages to FNMA, in exchange for FNMA's common stock. The amount of stock a mortgage seller was required to purchase was a specified percentage of the mortgage loans it sold to FNMA.

There was one problem, however, at least for FNMA's customers. The "nonrefundable capital contributions" they were required to make for the stock exceeded the price it was selling for on the market. In other words, in order to sell mortgage loans to FNMA, the firms were required to purchase prescribed amounts of FNMA stock at par value, or $100, while at the same time the stock was selling for an appreciably lesser price on the open market. It was generally felt that the difference between the price mortgage sellers were required to pay for the stock and

---

[4]The same publication notes (p. 7) that during the 1969–70 credit crunch, FNMA took 50 percent of all FHA and VA mortgages originated in the fourth quarter of 1969 and the first quarter of 1970.

its fair market value constituted a business expense, deductible in the year of issue. See H. Rept. 1662, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 816, and Code Commentary, J. Mertens, Law of Federal Income Taxation 227 (1975).

The Commissioner, however, took a different view of the matter and ruled that all of the purchase price must be capitalized. See Rev. Rul. 58–41, 1958–1 C.B. 86 (1958). In reaction to the Service's position, Congress enacted section 162(d) in 1960. See Pub. L. 86–779, 74 Stat. 998 (1960). Subtitled "Capital Contributions to Federal National Mortgage Association," section 162(d) explicitly allows a current deduction whenever the amount of capital contributions given for a share of FNMA stock under section 303(c) of the FNMA Charter Act exceeds the fair market value of the stock on the date of issue. The legislative history accompanying the enactment of section 162(d) explains:

> Problems have arisen as to the tax treatment provided for this stock which must be purchased by a taxpayer when he sells mortgage paper to FNMA. The problems have arisen because, although there is a market for the FNMA stock, the market price is appreciably below the stock issuance price, currently the market price being around 55 percent of the issuance price.
>
> Taxpayer-subscribers generally have assumed that any excess of the issuance price over the market price of this stock represented an ordinary and necessary expense incurred in carrying on their trade or business since they acquired the stock in order to sell their excess supply of mortgage paper. In 1958, however, the Internal Revenue Service ruled (Rev. Rul. 58–41, 1958–1 CB 86) that no part of the purchase price of stock of FNMA constituted a deductible business expense. Instead, it was held that the entire amount paid for the stock must be capitalized and treated as the cost of the stock so acquired. Thus, this ruling holds that there is no tax effect at the time of the purchase or issuance of the stock even though the market price of the stock then is substantially below the issuance price. Instead, the tax effect occurs only when the stock is sold by the taxpayer.
>
> Your committee believes that it is unfortunate to require the capitalization of these expenditures for FNMA stock by taxpayer-subscribers to the extent they represent the excess of purchase price over market price. Viewed from such a taxpayer's standpoint, the excess appears clearly to be expenditures which he must incur in order to sell the mortgage paper he holds. In view of this, your committee believes that such amounts should be treated as ordinary and necessary business expenses incurred in carrying on a trade or business. This, of course, means that in the transaction which occurs when the stock is sold (usually a capital transaction) the basis of the stock should not include this amount previously taken as a deduction. [H. Rept. 1662, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 816, 818.]

Subsequent to the enactment of section 162(d), this Court decided *Ancel Greene & Co. v. Commissioner*, 38 T.C. 125 (1962). *Greene*, involving a tax year prior to the effective date of section 162(d), in effect held that the difference between the $100 purchase price the petitioner therein was required to pay for FNMA stock and its average market price of approximately half that amount was deductible in the year of issue.[5] See also *McMillan Mortgage Co. v. Commissioner*, 36 T.C. 924 (1961). Shortly thereafter, the Internal Revenue Service revoked its prior ruling, and acquiesced in the *Greene* decision. Rev. Rul. 63–44, 1963–1 C.B. 11 (1963).

## II. *The 1968 Amendments*

In 1968, the rules governing transactions with FNMA and the nature of the private shareholders' interests in the corporation changed, and it is to the new situation we must address ourselves today. Prior to September 1, 1968, there were no restrictions on the resale of stock acquired by a mortgage seller-servicer when it sold mortgages to FNMA. In 1968, the FNMA Charter Act was amended, and FNMA was converted into a privately owned corporation. Accordingly, each share of outstanding nonvoting, $100 par common stock was changed to 1 share of voting, no par common stock, and the preferred stock previously held by the Secretary of the Treasury was retired. More significant, for our purposes, is that retention requirements were enacted for the first time as a prerequisite to servicing the mortgages sold to FNMA. Written into the provisions of the FNMA Charter Act and incorporated into regulations governing FNMA and its servicing contracts, the new law provided that each mortgage servicer was to own a certain amount of common stock of the corporation, measured by its stated value. The minimum amount of stock the servicers were required to hold was to be determined by the Secretary of Housing and Urban Development. However, such amount was

[5]Because shares of FNMA stock are remitted to the mortgage seller as part of the sales proceeds, the precise holding in *Ancel Greene & Co. v. Commissioner*, 38 T.C. 125 (1962), was that only the fair market value of the stock, rather than the entire $100 per share purchase price, was includable in petitioner's gross income. The result is essentially the same, of course, as including all of the proceeds from the sale of mortgages in gross income, and then allowing a deduction for the excess of the purchase price (or "nonrefundable capital contributions," as sec. 162(d) states it) over the fair market price value of the stock.

not to exceed 2 percent of the aggregate outstanding principal balances of all mortgages bought by FNMA after September 1, 1968, which are then serviced by the seller for FNMA.[6]

What we have then, for the year 1969, is a situation where the capital contributions petitioner was required to make for the stock were not in excess of the price FNMA stock was selling for on the open market.[7] However, because of the retention requirements, petitioner was not able to sell the stock so long as it serviced the outstanding mortgages. The mortgages were given for 20- and 30-year terms, but because of prepayment or other circumstances, the average life of an FNMA mortgage has been estimated to be between 12 and 20 years. The issue for our decision is whether the captial contributions for the 3,701 shares of FNMA stock petitioner was required to purchase in 1969 exceeded their "fair market value" on the issue date as that term is used in section 162(d).

Respondent contends that the retention requirements should be disregarded, arguing that section 162(d) is only applicable when the issue price is more than the market price at which the stock is currently trading. In essence, respondent contends that in determining fair market value pursuant to section 162(d), the restrictions FNMA imposes on disposition by seller-servicers should be disregarded.

Petitioner contends that is was a seller-servicer of mortgages sold to FNMA, that it was required to buy and retain FNMA stock as a part of the selling and servicing operations, and that fair market value cannot be determined without considering the restrictions on the sale of the stock imposed by FNMA. While the issue is a close one, we agree with petitioner.

Respondent would, in view of section 162(d) and *Greene,* have to concede that if the restrictions on sale of the FNMA stock were imposed for a specified period (for example, 12 years) solely as a part of the sales transaction and without regard to the mortgages sold, the restriction must be considered in determining fair market value. That the stock must be taken as

---

[6]See sec. 303(c) of the FNMA Charter Act, 12 U.S.C. sec. 1718, as amended by sec. 802(k)(2) of Pub. L. 90–448, 82 Stat. 538.

[7]The parties stipulated that for the purposes of these proceedings, the mean bid and asked prices of FNMA stock in the over-the-counter market was at all relevant times not less than the price petitioner was required to pay for the FNMA stock issued to it. However, petitioner concedes in his reply brief that the price it paid for the stock was in fact slightly lower than the quoted market price on the dates of issue.

a part of the sale, and the restriction is imposed as a part of the servicing, is not a distinction, when the economic realities are considered, of sufficient substance to require a different result.

Petitioner was a seller-servicer, a tandem operation representing two sides of the same business coin. Clearly, petitioner could not service without selling. And failing to sell would clearly have impaired these servicing operations since the mortgages it serviced were those sold, and since it had to sell FNMA mortgages from its inventory in order to originate new mortgages to sell and service.[8]

Additionally, the record suggests that FNMA generally expected the seller to service the mortgage. Thus, in explaining the commitment-purchase procedure, FNMA has stated "Usually the seller is also the servicer, although, FNMA does permit assignment of servicing with prior approval." (FNMA: Background and History 10 (FNMA 1975)). Petitioner originated $56,300,000 of FHA insured and VA guaranteed mortgage loans in 1969, $33 million of which were sold to FNMA. With a volume this large, it undoubtedly facilitates sales—whether FNMA or a thrift institution is the purchaser—to offer efficient servicing as a tandem operation to sales.

Finally, section 303(b) and (c) of the FNMA Charter Act itself contemplates applying the restrictions to the tandem operation of a seller-servicer. Section 303(b) and (c) requires "each mortgage seller" to accept up to 2 percent of the mortgage sold in FNMA stock as a part of the consideration received. These subsections also require "each servicer" to retain up to 2 percent—

of the aggregate outstanding principal balances of all mortgages of the corporation which have been purchased subsequent to September 1, 1968, and which are *then* serviced by such servicer for the corporation. * * * [Emphasis added.]

This language clearly contemplates applying restrictions to

---

[8]And FNMA was of critical importance in 1969:

"[FNMA's] services are generally called upon most heavily during cyclical credit squeezes, as in 1966 and 1969–1970.

    *      *      *      *      *      *      *

"during the 1969–1970 credit crunch FNMA took 50 percent of all FHA and VA mortgages originated in the fourth quarter of 1969 and the first quarter of 1970. * * * [FNMA: Background and History 7 (FNMA 1975)]"

FNMA post September 1, 1968, purchases which are "then" serviced.[9]

Respondent directs our attention to the legislative history of section 162(d) to support his position that the phrase "fair market value" as used in the statute can only mean the quoted market price. Indeed, respondent argues that since in one paragraph, the House committee report uses the phrase "the excess of purchase price over market price" to explain the deduction, petitioner is precluded from arguing that stock which cannot be resold for an average of 15 years must be discounted in order to arrive at its fair market value.

Nothing in the House committee report, however, persuades us that such a technical result was intended. The phrase Congress used in writing section 162(d) is "fair market value." The regulations interpreting the statute provide:

Sec. 1.162–19 Capital contributions to Federal National Mortgage Association.

(a) *In general.* The initial holder of stock of the Federal National Mortgage Association (FNMA) which is issued pursuant to section 303(c) of the Federal National Mortgage Association Charter Act (12 U.S.C., sec. 1718) * * * shall treat the excess, if any, of the issuance price (the amount of capital contributions evidenced by a share of stock) over the *fair market value of the stock* as of the issue date of such stock as an ordinary and necessary business expense paid or incurred during the year in which occurs the date of issuance of the stock. To the extent that a sale to FNMA of mortgage paper gives rise to the issuance of a share of FNMA stock during a taxable year beginning after December 31, 1959, *such sale is to be treated in a manner consistent with the purpose for, and the legislative intent underlying the enactment of, the provisions of * * * [section 162(d)].* [Emphasis added.]

Congress was forced to address the situation because the Internal Revenue Service would not allow a current deduction for an expense that was clearly a cost of doing business with FNMA. Congress addressed this problem by enacting section 162(d) which specifically allows a current deduction for the excess of the purchase price over *the fair market value* of the stock on the date of issue. Section 162(d) by its terms specifically

---

[9]This requirement was imposed by sec. 802(k)(2) of Pub. L. 90–448, 82 Stat. 538. The accompanying committee report explained the purpose of this provision:

"For the purpose of encouraging *users* of FNMA's services to develop and maintain their interest in and control of the corporation, each servicer of mortgages for FNMA would be required to own at all times a minimum amount of FNMA common stock. [S. Rept. 1123, 2 U.S. Code Cong. & Adm. News, 2873, 2945, 90th Cong., 2d Sess. (1968). Emphasis added.]"

The term "users" contemplates that Congress, in applying the retention requirement to servicers, had in mind seller-servicers.

applies to stock issued to an initial holder "pursuant to section 303(c) of the Federal National Mortgage Act." Petitioner received the stock in issue as an initial holder "pursuant to section 303(c)," and we see no reason, in interpreting the term "fair market value" in this remedial statute, to ignore the retention provisions governing petitioner's operations that are also contained in section 303(c).[10] As it has been noted in this context:

the unambiguous words of a section "can not be disregarded in the absence of some compelling indication that Congress did not intend them to apply to a situation like the present or that it intended them to remedy some particular evil of which the present situation is not a part." * * * [*Peppiatt v. Commissioner*, 69 T.C. 848, 850 (1978).]

It is hardly a novel idea that the fair market value of stock which cannot be resold for a length of time is less than the quoted market price of freely alienable stock. See Securities and Exchange Comm., Institutional Investor Study Report, H.R. Doc. No. 92–64, part 8 (Summary Volume), 92d Cong., 1st Sess. 118 (1971).[11] There are many court decisions which have made adjustments to the quoted market price of stock, which is restricted in order to arrive at its fair market value. *Le Vant v. Commissioner*, 376 F.2d 434 (7th Cir. 1967), affg. in part and revg. in part 45 T.C. 185 (1965); *Nee v. Katz*, 163 F.2d 256 (8th Cir. 1947); *Bassick v. Commissioner*, 85 F.2d 8 (2d Cir. 1936), cert. denied 299 U.S. 592 (1936); *Bolles v. Commissioner*, 69 T.C. 342 (1977); *Frank v. Commissioner*, 54 T.C. 75 (1970), affd. 447 F.2d 552 (7th Cir. 1971); *Husted v. Commissioner*, 47 T.C. 664 (1967). As one Court of Appeals stated, "A commodity freely salable is obviously worth more on the market than a precisely similar commodity which cannot be freely sold." *Worcester County Trust Co. v. Commissioner*, 134 F.2d 578, 582 (1st Cir. 1943).

---

[10]While we do not have the applicability of sec. 1054 before us, we note that that section requires the basis in a share of FNMA stock issued pursuant to sec. 303(c) of the FNMA Charter Act to be reduced by any deduction allowed pursuant to sec. 162(d). Additionally, any subsequent gain, to the extent petitioner lacked a substantial investment motive in acquiring and retaining the stock, would be reportable as ordinary income. See *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955); *W. W. Windle Co. v. Commissioner*, 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977).

[11]For an elucidating discussion on valuing securities that have restrictions on their immediate resale, see. D. Watts, "The Fair Market Value of Actively Traded Securities," 30 Tax Law. 51, 79 (1976). Mr. Watts asserts that the phrase "fair market value" appears in the Internal Revenue Code 136 times. He estimates that 114 of these provisions could apply to traded securities.

Indeed, it is implicit in the position of the Internal Revenue Service with regard to valuing securities that cannot immediately be sold because of securities law restrictions that such securities must be discounted. See Rev. Rul. 59–60, 1959–1 C.B. 237, as modified by Rev. Rul. 65–193, 1965–2 C.B. 370; Rev. Rul. 77–287, 1977–2 C.B. 319. And a note by independent auditors accompanying the financial statements of FNMA which were included in a 1970 prospectus and are part of the record in this case states "FNMA believes that the quoted market price of its common stock is not representative of fair market value in the hands of mortgage sellers because of the restrictions on the disposition of such stock which were imposed in September 1968."

We therefore hold that the quoted market price of freely alienable FNMA stock does not govern the fair market value of shares which petitioner was required to purchase and retain as a mortgage seller-servicer under section 303(c) of the FNMA Charter Act. Petitioner is entitled to a deduction under section 162(d) for the excess of the price it paid for the stock over its fair market value on the date of issue, and fair market value can only be determined by considering the impact of the restrictions on the stock.[12]

## III. *Valuing the Stock*

We next turn to the issue of valuing the 3,701 shares petitioner was required to purchase in 1969 and retain so long as it serviced the mortgages. The valuation of stock for income tax purposes is a question of fact for the Tax Court. *Hamm v. Commissioner*, 325 F.2d 934 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. Generally,

The basis of the definition of fair market value is the assumption that hypothetical willing buyer and hypothetical willing seller, neither being under a compulsion to buy or sell and both having reasonable knowledge of the relevant facts, will arrive at some sale price for the property in question. [*Estate of Reynolds v. Commissioner*, 55 T.C. 172, 195 (1970).]

---

[12]Since we hold petitioner is entitled to the benefits of sec. 162(d), we do not deal with its compelling alternative argument that, in selling mortgages to FNMA, it need report only the money received plus the fair market value of the stock received (including the impact of the restrictions on sale). See *Ancel Greene & Co. v. Commissioner*, 38 T.C. 125 (1962).

See sec. 20.2031–1(b), Estate Tax Regs., and sec. 25.2512–1, Gift Tax Regs.

Petitioner produced an expert witness, Jerome Kern, who testified orally and submitted a detailed written report on the valuation of FNMA stock in petitioner's hands. His credentials as an expert witness in this area are impressive. He has practiced corporate and securities law for many years, taught at a leading university, and has served in an executive capacity with several securities firms which are members of the New York Stock Exchange.

Mr. Kern estimated that in his various activities, he has professionally valued not fewer than 200 corporate securities. In preparing his report, he studied the background and laws relating to FNMA and followed the guidelines that respondent has issued with respect to the valuation of corporate securities. These guidelines state that "A sound valuation will be based upon all of the relevant facts" and that "All relevant facts and circumstances that bear upon the worth of restricted stock * * * must be taken into account in arriving at the fair market value of such securities." Rev. Rul. 59–60, 1959–1 C.B. 237, 238 (1959);[13] Rev. Rul. 77–287, 1977–2 C.B. 319, 321 (1977).

In his assessment of what a willing buyer would pay in 1969 for FNMA stock that is restricted from resale for an average of 15 years,[14] Mr. Kern determined that the stock should be discounted at least 80 to 85 percent. He reached this conclusion after carefully considering FNMA's background, calculations of market performance, future earnings prospects, and other considerations. He concluded, however, that the overriding factor which necessitated such a large discount was the long restriction on the disposition of the stock by petitioner. Mr. Kern stated that most restricted securities have holding periods of from 2 to 5 years, for which they are discounted anywhere from

---

[13]Although Rev. Rul. 59–60, 1959–1 C.B. 237 (1959), sets forth the proper approach to use in the valuation of closely held corporate stocks for estate and gift tax purposes, the general approach, methods, and factors outlined in Rev. Rul. 59–60 were later extended by the Internal Revenue Service to valuations of corporate stocks for income and other tax purposes. Rev. Rul. 68–609, 1968–2 C.B. 327, 328 (1968).

[14]Although mortgages sold to FNMA typically have a 25- to 30-year term, certain events, such as refinancing the loan or prepayment of the mortgage, will cause the mortgage to have a shorter life. Because the average life of an FNMA mortgage has been estimated to be between 12 and 20 years, Jerome Kern used 15 years in making his evaluation. On the facts we have before us, it appears to be a reasonable estimate of how long petitioner would be required to hold the stock it was issued in 1969. We also note that respondent did not object to petitioner's requested finding to this effect.

zero to 65 percent, depending on the size of the block, the liquidity of the market, and the volatility of the stock. Although characterizing FNMA stock as not being volatile in the traditional sense, he believed that the stock was very speculative in 1969 due to the nature of governmental control over the corporation.[15] Kern testified that he was not sure that he would advise a client to purchase a security for any price that must be retained for approximately 15 years, but that the FNMA stock that petitioner was required to purchase in 1969 was worth no more than 15 to 20 percent of its selling price at the time.

Mr. Kern was a knowledgeable witness. We found his testimony credible and generally accept his conclusions. However, we find he gave too much weight to the potential disadvantages of governmental influence in FNMA affairs and too little weight to the potential benefits, including favorable access to capital. We therefore feel that a discount of 75 percent (rather than the 85 percent petitioner contends) is appropriate.

Respondent argues that any substantial discount is too great. Unfortunately, however, respondent presented no evidence on the issue of valuation. He argues on brief that petitioner already received a sufficient discount because the issue price it paid for the FNMA stock was lower than the average market price FNMA stock was selling for in 1969. However, the only authority respondent cites to support his position is a case which we find inapposite.[16] Indeed, in its own guidelines, respondent has advised that in valuing securities which are restricted from immediate resale because of Federal securities laws that:

---

[15]In 1968, FNMA became totally owned by private shareholders. However, it is still subject to governmental control. For instance, 5 of the 15 directors are appointed by the President of the United States. In addition, the Secretary of Housing and Urban Development exercises extensive regulatory powers over FNMA, including the powers to determine the maximum amount of annual dividends that can be paid to shareholders; to approve the issuance of all securities or obligations of FNMA; and to require that a portion of FNMA mortgage purchases be related to housing for low and moderate income families, but with a reasonable economic return to the corporation.

[16]Respondent cites *Kline v. Commissioner*, 44 B.T.A. 1052 (1941), affd. 130 F.2d 742 (3d Cir. 1942), cert. denied 317 U.S. 697 (1943), which involved the valuation for gift tax purposes of stock put in an irrevocable trust. The taxpayer was restricted from selling the stock of the corporation, his employer, without its consent, and upon his death, the shares had to be offered to the corporation for 75 percent of the book value at the last closing or 50 percent if he resigned or 33½ percent if he was discharged. In affirming the Commissioner's valuation of 75 percent of the book value, the Court noted that the company was old, sound, and prosperous, that the stock was not speculative, and that the stock could be held with substantial assurance of safety. Furthermore, considering that the taxpayer had held the position of director and executive vice president of the company for many years, the Court found that it was highly improbable that he would be discharged, which would give rise to the lesser option price. Looking at the facts and circumstances of *Kline v. Commissioner, supra,* we find it easily distinguishable from the case before us.

Resale provisions found in the restriction agreements must be scrutinized and weighed to determine the amount of discount to apply to the preliminary fair market value of the company. The two elements of time and expense bear upon this discount; the longer the buyer of the shares must wait to liquidate the shares, the greater the discount. * * *

The relative negotiation strengths of the buyer and seller of restricted stock may have a profound effect on the amount of discount. * * * [Rev. Rul. 77–287, 1977–2 C.B. 319, 321–322 (1977).]

Considering all the facts and circumstances surrounding FNMA, and particularly in light of the retention period of the stock in petitioner's hands, and the fact that 1969 was the first transitional year subsequent to amendments which severely altered the structure of the corporation, we hold that the stock petitioner was required to purchase and retain in 1969 must be discounted by 75 percent to arrive at the fair market value.

Unfortunately, we do not have before us the precise issue dates of the FNMA stock petitioner received, nor the price FNMA stock was traded for in the over-the-counter market on specific dates. However, it is part of the record that petitioner was required to purchase and retain 3,701 shares of stock in 1969 for an aggregate purchase price of $498,513, or for an average price of $134.70 a share. In addition, the parties submitted a 1970 prospectus of FNMA which shows that the average over-the-counter market price of FNMA common stock for 1969 was $184.50.[17] Discounted by 75 percent, the fair market value of the shares in petitioner's hands was $46.13 a share.[18] Accordingly, we hold that the excess of the purchase price ($498,513) over the fair market value of the stock, which we find in this instance to be $170,727.13, is deductible for the year 1969 by petitioner under section 162(d).

*Decision will be entered under Rule 155.*

---

[17]This figure does not take into account either of the two subsequent 4-for-1 stock splits.

[18]Petitioner's witness applied the discount to the issue price of the stock to petitioner because he did not have the market quotations of FNMA stock on the specific dates of issue, and he was told that the difference between the issue price and the quoted market price was minimal. However, considering that petitioner concedes on brief that the issue price was less than the quoted market price on the date of issue, we think it more prudent to apply the discount to the average market price of FNMA stock for 1969.