JACK M. DURLIAT AND PATRICIA A. DURLIAT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Durliat v. Commissioner
Docket No. 2167-79.
United States Tax Court
T.C. Memo 1982-563; 1982 Tax Ct. Memo LEXIS 181; 44 T.C.M. (CCH) 1242; T.C.M. (RIA) 82563; September 27, 1982. Richard P. Slivka and Lynn T. Wood, for the petitioners. Cynthia J. Olson, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in the petitioners' Federal income taxes for the taxable year 1976 in the amount of $43,125. The issues for decision are: (1) whether the amount received by Capital Associates International (Capital), a partnership in which petitioner Jack Durliat was a partner, on the disposition of certain computer equipment was gain on the sale of the computer equipment by Capital or compensation for services in the nature of a commission or finder's fee; and (2) whether the amount received by Capital in the disposition of this computer equipment was capital gain or gain attributable to property held by Capital *182 primarily for sale to customers in the ordinary course of its trade or business. The determination of these issues will decide whether Capital may treat $157,908 received in 1976 in connection with the disposition of certain computer equipment as short-term capital gain. Respondent characterizes this gain as ordinary income. If correct, this characterization as ordinary income will result in a deficiency in petitioners' individual Federal income tax because it prevents petitioners from netting the income against their 1976 short-term capital losses. The remaining issues have either been conceded or are directly contingent on our resolution of the issues stated above. FINDINGS OF FACT Some of the facts are stipulated. The stipulation of facts and stipulated exhibits are incorporated herein by this reference. Petitioners Jack M. Durliat and Patricia A. Durliat filed joint Federal income tax returns for the taxable year 1976. At the time they filed their petition in this case, the petitioners resided in Colorado Springs, Colorado. Patricia A. Durliat is a party to this action by virtue of her filing a joint return as spouse of Jack M. Durliat. The term "petitioner" shall *183 refer to Jack M. Durliat unless otherwise indicated. Capital was a general partnership formed in 1976 between petitioner and Richard Kazan for the express purpose of providing computer lease funding and financing. The business of Capital was to provide attractive lease financing arrangements for users of computer equipment. In the early years of its existence Capital served as a computer lease broker, seeking out potential computer lessees and lessors and introducing the two for a commission. Frequently the user was leasing its equipment with an option to purchase from the manufacturer at the time Capital made its initial contact. Capital first determined whether or not the user were interested in investigating the possibility of improving its lease finance arrangement by a sale and leaseback of its equipment. If the user were interested in pursuing the matter, Capital then determined the user's needs and desires and the option price of the equipment and, based upon that information, assessed the probability that a third-party lessor would be willing to purchase the equipment and execute a lease suitable to the user. Capital then contacted a third-party financial institution, *184 communicated this information and inquired as to whether or not the third-party was interested in entering into the transaction. If the third-party financial institution accepted, the user exercised his option to purchase from the manufacturer. The third-party financial institution paid the purchase price of the equipment directly to the manufacturer. The user, after exercising his option, conveyed the equipment to the third-party financial institution. The user would receive a bill of sale from the manufacturer. The user would then execute a bill of sale of the third-party financial institution. The user remained responsible for maintaining hazard insurance on the equipment. The third-party purchaser would be named as a payee or additional insured on the policy. Capital would not be named on the insurance policy as a payee because it would not have an interest in the equipment. When the potential lessee and lessor introduced to each other by Capital actually reached a lease agreement as to a piece of computer equipment, Capital would receive a finder's fee or commission based upon a percentage of the lessor's computer costs. Such finder's fees typically amounted to a percentage *185 in the range of 1/2 to 1-1/2 percent of the computer cost. The greatest percentage Capital received as a finder's fee in any such transaction was 2 percent. Capital anticipated that eventually it would be capable of financing the leasing arrangements on its own, without the participation of third-party financial institutions. By 1977 Capital was able to purchase computer equipment itself for lease. Capital received rental income in those transactions where Capital was the purchaser/lessor of the computer equipment. For the year ending December 31, 1976, Capital reported on its partnership return Form 1065 ordinary income from commissions in the amount of $47,618.18. Except for the gain which is the subject of this action, the reported commission income was Capital's sole source of income in 1976. In 1976 Toyota Motor Sales, U.S.A., Inc. (Toyota) was leasing the computer system which is the subject of this controversy (hereinafter the "System") from International Business Machines Corporation (IBM) under a lease with option to purchase. In Capital's first venture into the leasing business (as lessor rather than as a broker) Capital approached Toyota with a proposal whereby *186 Toyota would exercise its right to purchase the System from IBM for a price of $1,519,455; Toyota would then sell the System to Capital for the same price, and then lease the System back from Capital on terms more favorable than those contained in the IBM lease. After extensive negotiations Toyota and Capital agreed to the sale and lease transactions and a lease was mailed to Toyota for execution. Prior to execution of the lease and consummation of the transaction with Toyota, Capital learned that an essential lender's insurance policy issued by Lloyds of London in connection with the transaction had been withdrawn and that, as a result, Capital's source of funds for financing the purchase of the System had withdrawn its loan commitment. Capital diligently searched for an alternative lender willing to finance Capital's purchase of the System, but no lenders were willing to make such a loan without an effective Lloyds of London lender's policy. Capital saw a resale of the System soon after the purchase as a solution to its problem. Such a resale would make outside financing unnecessary. Capital proposed to Sagamore Leasing Corporation (Sagamore) that Sagamore purchase the system *187 from Capital and in turn lease the System to Toyota on lease terms substantially the same as those previously negotiated between Capital and Toyota. After extensive negotiations between Capital and Sagamore over the purchase price to be paid Capital for the System, and negotiations between Sagamore and Toyota over the lease terms, an agreement was reached whereby Capital would sell the System to Sagamore for the price of $1,677,363 and Sagamore would lease the System to Toyota. On October 8, 1976, prior to purchase of the System, Sagamore executed a lease agreement with Toyota. On October 20, 1976, Toyota and IBM executed an agreement to purchase the System and IBM executed a bill of sale transferring the System to Toyota. On October 20, 1976, Capital purchased the System from Toyota, by bill of sale, for the agreed price of $1,519,455. Also on October 20, 1976, Capital sold the System to Sagamore, by bill of sale, for the agreed price of $1,677,363, at a gain to Capital of $157,908. Pursuant to instructions contained in a letter dated October 8, 1976, from Capital to Sagamore, Sagamore paid the full purchase price for the System by making direct payment, on October 20, 1976, to *188 IBM in the amount of $1,519,455 and by wire transfer on November 4, 1976 to Capital in the amount of $157,908. During the brief period of Capital's ownership, the System was subject to the creditors of Capital. Sagamore withheld payment until Capital provided title opinions indicating that there were no outstanding liens that would attach to the System during Capital's ownership. At all times from the date Capital approached Toyota with the sale and leaseback proposal, Capital intended to purchase and own the System. At all times subsequent to the time Capital realized it could not finance the proposed Toyota lease, the relationship between Capital and Sagamore was that of parties acting at arms' length in a bona fide sales transaction. Capital was not an agent of Sagamore and at all times acted in its own best interest, not in the interest of Sagamore. Capital did not have the power or authority to bind Sagamore in any aspect of the transaction. Sagamore did not know, until the transaction was consummated, the price Capital paid Toyota for the System. None of the parties ever discussed the transaction in terms of a commission or finder's fee, but rather, always in terms of *189 a purchase by Capital and sale to Sagamore. Since the inception of Capital, Capital has never bought and sold computers or other equipment or property except (a) those used computers which Capital has first placed into lease service and which are no longer fit for leasing, and (b) the System, which is the subject of this proceeding. Capital reported the sale of the System as short-term capital gain on its 1976 Federal income tax return. The petitioners reported their share of this item of partnership income on their Federal individual income tax return for the taxable year 1976. In his notice of deficiency, the Commissioner determined that the partnership and the petitioners should have reported the sale of the System as ordinary income because "The computer sold in 1976 was property held for sale to customers in the ordinary course of the partnership's trade or business." ULTIMATE FINDINGS OF FACT Capital's gain in the Toyota transaction in economic reality was gain from the sale of a capital asset and not a commission, finder's fee or income from the sale of property held primarily for sale to customers in the ordinary course of its trade or business. The substance of *190 the transaction is consistent with its form. OPINION Capital was a general partnership formed for the purpose of providing computer lease funding and financing. Initially, it did this by operating as a lease broker, although it looked forward to the day that it would be able to purchase the computer equipment itself and be the lessor. The transaction before us was intended to be the fulfillment of this goal. Capital agreed with Toyota that Toyota would purchase the System from IBM, Capital would purchase the System from Toyota, and Capital would lease the System back to Toyota. The special insurance Capital had anticipated, without which the financing that it had arranged would not be available, however, was withdrawn. After several efforts to refinance the project in its own capacity, Capital finally turned to Sagamore who agreed to purchase the System from Capital and then lease the System to Toyota on substantially the same terms as Capital and Toyota had already agreed upon. The respondent argues that Capital realized ordinary income from this transaction because: (1) Capital's gain was in reality compensation for services in the nature of a commission or a finder's fee, *191 or because (2) the System was property held by Capital primarily for sale to customers in the ordinary course of its trade or business. Respondent first argues that Capital's gain represented a commission or a finder's fee. We have found otherwise. Although Capital previously had a broker's relationship with Sagamore, the transaction at issue was fundamentally different from these earlier transactions. This is evidenced not only by the structure of the transaction but also by the bargaining relationships between the parties. Sagamore was unaware of the terms by which Capital purchased the System from Toyota. The amount of gain received by Capital was many times greater than what Sagamore would pay as a commission. The entire relationship between Capital and Sagamore was one of sale and purchase and not one of compensation for services. The respondent seeks support from several cases in which courts have found that the economic substance was other than the form of a transaction. The very nature of the issue demands that our decision be based on the facts and circumstances of our case. Our examination of these facts reveals that the economic substance and form of this transaction *192 were the same and that Capital did not receive compensation for services in the form of a commission or finder's fee in this transaction. The second issue for decision is whether Capital's gain on the disposition of the System was capital gain or gain attributable to property held by Capital primarily for sale to customers in the ordinary course of its trade or business. The respondent asserts that Capital purchased the System for the purpose of resale. Capital had no intention of reselling the System when it agreed to purchase it from Toyota. By the time the transaction was consummated, however, it had agreed to sell the System to Sagamore. Our examination of the facts has demonstrated to us, and we have found, that this sale was not in the ordinary course of Capital's trade or business. Capital was in the lease financing business, not the business of buying and selling computers. Indeed, it was not Capital's intention to buy and then sell this computer but the withdrawal of its termination insurance forced Capital to dispose of computer equipment it had agreed to purchase. The respondent argues that the fact that Capital bought and sold the System on the same day is of *193 significance. The respondent cites dicta in Commissioner v. Gillette Motor Transport, Inc.,364 U.S. 130, 133 (1960), to suggest that an asset must be held for a period of time to be a capital asset. It is true that Capital had only transitory title, but we see this as no infirmity. There is nothing unusual about this circumstance. Indeed the Commissioner's own regulations provide that "In determining whether property is a 'capital asset', the period for which held is immaterial." Sec. 1.1221-1(a), Income Tax Regs.
The respondent further argues that the purchase and sale of the System by Capital was so integrally related to its leasing business that capital gain treatment should be denied. The respondent directs our attention to McMillan Mortgage Co. v. Commissioner,36 T.C. 924 (1961); Ancel Greene & Co. v. Commissioner,38 T.C. 125 (1962); and Hollis v. United States,121 F. Supp. 191 (N.D. Ohio, 1954). McMillan and Ancel Greene & Co. are cases involving whether Federal National *194 Mortgage Association capital stock, purchased pursuant to Federal regulations in connection with a company's mortgage business, would be capital assets or whether the cost of purchase was a deductible business expense. In McMillan this Court agreed with the taxpayer that such stock purchases were part of its business activity and deductible. In that case not only was McMillan required by Federal regulation to purchase this stock in order to transact its normal business, but the taxpayer disposed of the stock in question in no less than forty-eight transactions during the years before the Court. In Ancel Greene & Co. we found the stock to be a capital asset because we found an investment purpose. In Hollis, a case decided under the 1939 Internal Revenue Code, the Court found that the art objects of an art dealer were not capital assets. These cases are obviously distinguishable. We have carefully considered the evidence presented, including the testimony of the petitioner which we found both forth-right and credible, and have found that the sale was not in the ordinary course of Capital's trade or business. Because of concessions by the petitioner, Decision *195 will be entered under Rule 155.